Filed 11/14/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| McMILLIN MANAGEMENT SERVICES, L.P. et al., | D069814 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2012-00104981-CU-IC-CTL) |
| FINANCIAL PACIFIC INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEALS from judgments of the Superior Court of San Diego County,

Katherine Bacal, Judge.  Reversed as to respondent Lexington Insurance Company;

affirmed as to respondent Financial Pacific Insurance Company.

Ryan & Associates and Greg J. Ryan for Plaintiffs and Appellants.

Gordon & Rees, Arthur Schwartz and Randall P. Berdan for Defendant and

Respondent Financial Pacific Insurance Company.

---

[*]      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.C.

Lewis Brisbois Bisgaard & Smith, Rebecca R. Weinreich, Christine Magarian; Herold & Sager, Andrew D. Herold and Kendall Dulich for Defendant and Respondent Lexington Insurance Company.

## I.

## INTRODUCTION

McMillin Management Services, L.P. and Imperial Valley Residential Valley Residential Builders, L.P. (collectively "McMillin")[1] filed this action against numerous insurance companies, including respondents Lexington Insurance Company (Lexington) and Financial Pacific Insurance Company (Financial Pacific). In its complaint, McMillin alleged that it had acted as a developer and general contractor of a residential development project in Brawley (the Project) and that it had hired various subcontractors to help construct the Project. As relevant to this appeal, McMillin alleged that Lexington and Financial Pacific breached their respective duties to defend McMillin in a construction defect action (underlying action) brought by homeowners within the Project. McMillin alleged that Lexington and Financial Pacific each owed a duty to defend McMillin in the underlying action pursuant to various comprehensive general liability (CGL) insurance policies issued to the subcontractors that named McMillin as an additional insured.

---

[1] None of the parties make any argument concerning the significance of the distinctions between these parties. Accordingly, we refer to them collectively as McMillin.

Whether an insurer owes an insured a duty to defend a third party's lawsuit depends, in the first instance, on a comparison of the allegations of the third party's complaint and the terms of the insured's policy. (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655.) If any facts stated in or fairly inferable from the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises. (*Ibid.*)

Lexington filed a motion for summary judgment in which it contended that it did not owe McMillin a duty to defend the underlying action because there was no potential for coverage for McMillin under the Lexington policies. Lexington noted that the policies contained additional insured endorsements that provided coverage to McMillin for " 'liability *arising out of* [the named insured subcontractors'] ongoing operations.' " (Italics altered.) Lexington argued that there was no potential for coverage for the construction defect claims asserted against McMillin in the underlying action because McMillin had "no liability to the homeowners until after the close of escrow of each homeowner's property" and thus, McMillin "did not have any liability to plaintiffs [in the underlying action] for property damage that took place *while* [the subcontractors] were working on the Project . . . ." (Italics added.) The trial court granted Lexington's summary judgment motion on this ground, reasoning, that there was no possibility for coverage for McMillin as an additional insured under the policies "[b]ecause there were no homeowners in existence until after the subcontractors' work was complete[ ] . . . ."

On appeal, McMillin contends that the fact that the homeowners did not own homes in the Project at the time the subcontractors completed their work does not

3

establish that its liability did not *arise out of* the subcontractors' ongoing operations.  In support of this contention, McMillin argues that the endorsements "make no reference to *when* liability must arise," and that nothing in the text of the endorsements "requires that the homeowners exist or make their claims during ongoing operations."  In contrast, Lexington argues that "since the [h]omeowners' cause of action accrued after operations were completed, McMillian could have no liability to the homeowners *during* the [subcontractors'] 'ongoing operations.' "  (Italics altered.)  McMillin's argument is supported by the text of the endorsements, while Lexington's argument is not.  The endorsements do not provide coverage solely for "liability . . . *during* the [subcontractors'] 'ongoing operations' " (italics altered), but rather, broadly provide for coverage for liability " '*arising out of*' " (italics added) such operations.  Thus, the fact that there were no homeowners in existence at the time the subcontractors completed their ongoing operations does not establish that McMillin could not have potential liability to the homeowners *arising out of* the subcontractors' ongoing operations.  Accordingly, the trial court erred in granting Lexington's motion for summary judgment on this ground.

Financial Pacific also filed a motion for summary judgment on the ground that it did not owe McMillin a duty to defend the underlying action.  Financial Pacific contended that McMillin was seeking coverage based on policies issued to subcontractors that installed drywall on the Project, and that neither the complaint in the underlying action nor any extrinsic evidence established that the homeowners in the underlying action had sought potentially covered damages arising out of the subcontractors' drywall

4

installation. The trial court granted Financial Pacific's motion on this basis and entered a judgment in its favor.

On appeal, McMillin contends that the trial court erred in granting Financial Pacific's motion because there is a triable issue of fact with respect to whether there was a potential for coverage under the policies. In the unpublished portion of this opinion, we conclude that the trial court properly determined that there was "no potential for coverage" under the relevant polices and that Financial Pacific was entitled to judgment as a matter of law.

Accordingly, we reverse the summary judgment in favor of Lexington and affirm the summary judgment in favor of Financial Pacific.

II.

FACTUAL AND PROCEDURAL BACKGROUND

McMillin acted as the developer and general contractor of the Project. McMillin hired numerous subcontractors to perform construction work on the project, including Martinez Construction Concrete Contractor, Inc. (Martinez), Rozema Corporation (Rozema), A.M. Fernandez Drywall (A.M. Fernandez), and J.Q. Drywall.

Lexington issued CGL policies to Martinez and Rozema and Financial Pacific issued CGL policies to A.M. Fernandez and J.Q. Drywall. The Lexington and Financial Pacific policies name McMillin as an additional insured.

McMillin completed construction of the homes in the Project in June 2005.

5

In June 2010, several homeowners within the Project filed the underlying action against McMillin. The homeowners alleged that they had discovered defective conditions arising out of the construction of their homes.

McMillin tendered its defense of the underlying action to Lexington and Financial Pacific, among other insurers. Both Lexington and Financial Pacific refused to defend McMillin.

In October 2012, McMillin asserted claims against Lexington and Financial Pacific for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. With respect to each claim, McMillin contended that Lexington and Financial Pacific had breached their respective contractual obligations to defend McMillin in the underlying action.[2]

Lexington and Financial Pacific each filed a motion for summary judgment in which they contended that they did not owe McMillin a duty to defend the underlying action and that McMillin would therefore be unable to establish any of its claims as a matter of law.

The trial court granted both motions. The court subsequently entered a summary judgment in favor of Lexington and a separate summary judgment in favor of Financial Pacific.

---

[2]     McMillin states in its brief on appeal that "the duty to indemnify is not at issue in this action."

6

McMillin filed a notice of appeal from the summary judgment in favor of Lexington, and filed a second notice of appeal from the summary judgment in favor of Financial Pacific.

## III.

## DISCUSSION

*The trial court erred in granting Lexington's motion for summary judgment, but properly granted Financial Pacific's motion for summary judgment*

McMillin claims that the trial court erred in granting Lexington's and Financial Pacific's motions for summary judgment. McMillin maintains that the trial court erred in concluding that neither Lexington nor Financial Pacific had a duty to defend McMillin in the underlying action, and thus, that McMillin could not establish any of its claims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.

A. *General principles of law relevant to both appeals*

    1. *The law governing summary judgment*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)

7

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143.)

　　2. *The duty to defend*

In *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277 (*Hartford*), the Supreme Court explained that "[t]he duty to defend is guided by several well-established principles.  An insurer owes a broad duty to defend against claims that create a potential for indemnity under the insurance policy.  [Citation.]  An insurer must defend against a suit even ' "where the evidence suggests, but does not conclusively establish, that the loss is not covered." ' "  (*Id.* at p. 287.)

The *Hartford* court also explained the manner by which a court is to determine whether an insurer owed its insured a duty to defend:

> " 'Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy.  [Citation.]  But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered.'  [Citation.]  This includes all facts, both disputed and undisputed, that the insurer knows or ' "becomes aware of" ' from any source . . . .  'Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.'  [Citation.]  Thus, '[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the

policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.' [Citation.] In general, doubt as to whether an insurer owes a duty to defend 'must be resolved in favor of the insured.' " (*Hartford*, *supra*, 59 Cal.4th at p. 287.)

However, "[w]hile the duty to defend is broad, it is 'not unlimited; it is measured by the nature and kinds of risks covered by the policy.' " (*Hartford*, *supra*, 59 Cal.4th at p. 288.)

The *Hartford* Court also explained the relative burdens of proof in a case in which the insured contends that an insurer breached the duty to defend:

> " '[T]he insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.' " [Citation.] Thus, an insurer may be excused from a duty to defend only when ' "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." ' " (*Hartford*, *supra*, 59 Cal.4th at p. 288.)

B. *The trial court erred in granting Lexington's motion for summary judgment*

1. *Additional factual and procedural background*

a. *The Project*

As noted in part II, *ante*, McMillin developed and acted as the general contractor for the Project. Martinez performed concrete flatwork on the Project between 2003 and November 2005. Rozema performed lath and stucco work on the Project between March 2003 and October 2005. McMillin completed construction of the homes in the Project by

9

mid-June 2005.[3]  McMillin completed all initial sales of the homes in the Project by early

August 2005.

b.  *Lexington's policies*

i.  *The policy periods*

Martinez and Rozema each obtained CGL coverage through policies issued by

Lexington.  Lexington issued two CGL policies to Martinez for the policy periods

February 27, 2004 through February 27, 2005 and February 27, 2005 through February

27, 2006, respectively.  Lexington issued a CGL policy to Rozema for the policy period

October 1, 2004 through October 1, 2005.

ii.  *The insuring agreements*

All three policies contain identical insuring agreements that provide that

Lexington would pay those sums that the insured became legally obligated to pay

because of " 'property damage' " caused by an " 'occurrence' " during the policy period.

The policies define "property damage" as:

> "a. Physical injury to tangible property, including all resulting loss of
> use of that property.  All such loss of use shall be deemed to occur at
> the time of the physical injury that caused it; or

---

3      As indicated in the text, the parties' statements of undisputed facts state that
McMillin completed construction of the homes in the Project by *mid-June 2005*, but that
Martinez performed work on the Project until *November 2005* and Rozema performed
work on the Project until *October 2005*.  The trial court repeated these dates in its
summary judgment order.  The parties do not explain this apparent incongruity in their
briefing.  However, McMillin states in its opening brief, "McMillin concedes the
homeowners did not exist until after the Project was completed."  Accordingly, we
assume for purposes of this decision that all of Martinez's and Rozema's work was
completed prior to the date on which homeowners purchased the homes in the Project.

"b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

The policies define "occurrence" as:

"[A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policies further provide that Lexington has the duty to defend any suit seeking such damages.

### iii. *The additional insured endorsements*

The Lexington policies contain substantively identical additional insured endorsements that amend the polices to provide coverage to McMillin " 'but only with respect to liability arising out of your [i.e., Martinez's or Rozema's] ongoing operations performed for [McMillin].' " The endorsements also each contain an exclusion that states:

"With respect to the insurance afforded to these additional insureds, the following exclusion is added:

". . . Exclusions

"This insurance does not apply to 'bodily injury' or 'property damage' occurring after:

"(1) All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

"(2) That portion of 'your work' out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or

11

subcontractor engaged in performing operations for a principal as a part of the same project."

c. *McMillin's complaint in this action*

McMillin alleged in its complaint in this action that Martinez and Rozema had acted as subcontractors on the Project. McMillin also alleged that Lexington had issued CGL policies to both Martinez and Rozema, and that the policies listed McMillin as an additional insured. McMillin further alleged that the complaint in the underlying action "sought damages against [McMillin] arising out of alleged negligent and defective work of [McMillin] and its subcontractors and suppliers on the Project."

d. *Lexington's motion for summary judgment*

Lexington filed a motion for summary judgment on the ground that it did not owe McMillin a duty to defend the underlying action because there was no possibility for coverage under the policies, in light of the additional insured endorsements. Specifically, Lexington noted that the endorsements provided coverage only for " 'liability arising out of your [i.e., Martinez's or Rozema's] ongoing operations performed for [McMillin].' " (Italics omitted.) Lexington argued that there was no possible coverage under the endorsements because there were no homeowners who could have brought construction defect claims against McMillin during the time that Martinez's or Rozema's operations were ongoing. Specifically, Lexington argued in relevant part:

> "McMillin would have no liability to the homeowners until after the close of escrow on each homeowner's property. [¶] Furthermore, pursuant to well-established California law, a construction defect action does not accrue until the plaintiff discovers the defect. [Citation.] Therefore McMillin did not have any liability to the homeowners until after close of escrow of their property, and only

12

after the homeowners discovered the defects complained of in the [underlying action]. [¶] . . . [P]laintiffs [in the underlying action] waited approximately five to seven years after taking possession of their properties to file [the underlying action]. As such, because McMillin did not have any liability to plaintiffs [in the underlying action] for property damage that took place *while Martinez and Rozema were working on the Project* . . . the allegations in the [underlying action] are not covered under the ongoing operations additional insured endorsements to the [p]olicies." (Italics added.)

Lexington further argued "it is clear that the claims at issue in the [underlying action] constitute claims for *completed* operations" (italics added), and that the language of the endorsements made clear that McMillin was entitled to coverage only for *ongoing* operations claims.

Finally, Lexington contended that McMillin "understood the difference between an 'ongoing operations' additional insured endorsement and a 'completed operations' version." In support of this contention, Lexington cited a memorandum that McMillin's risk manager, Jim Jordan, drafted in May of 2003, summarizing the standard additional insured endorsement form used in the Martinez and Rozema policies. Jordan's memorandum states in relevant part:

> "[The ongoing operations endorsement] restricts coverage for the Additional Insured to liability only arising out of the subcontractors' 'ongoing operations.' *In other words, the coverage for the Additional Insured ends when the subcontractor's work is no longer ongoing . . . or, in other words, is finished or completed . . . .*" (Emphasis and omissions are from Lexington's brief.)

### e. *McMillin's opposition*

McMillin filed an opposition in which it argued that the fact that Martinez's and Rozema's work on the Project was completed before the homeowners owned their homes

13

or made their claims in the underlying action did not establish the lack of a potential for coverage under the additional insured endorsements. McMillin noted that the endorsements in the relevant policies provided coverage to McMillin " 'with respect to liability **arising out of** . . . **ongoing operations** performed' " for McMillin. McMillin argued, "This language does not incorporate any coverage limitations related to when the liability must arise. Instead, it told McMillin at the time operations were ongoing, that any liability 'arising out of' those operations would be insured."

McMillin also argued that whether it was covered under the endorsements was determined by "when the property damage occurred" (italics omitted) and that Lexington had presented "no evidence . . . that any property damage could only have occurred after operations were completed."

McMillin maintained that Lexington was mistaken in contending that "no coverage is triggered because the homeowners' cause of action did not accrue until they discovered the defects." McMillin reasoned, "[T]hat is not the standard for the duty to defend[,] which depends upon when property damage *occurs*, not when it is discovered."

Finally, McMillin contended that, because the proper interpretation of the endorsements was a legal question, any statements made in Jordan's memorandum concerning coverage were "irrelevant and immaterial to whether a defense is owed." (Italics omitted.) McMillin also argued that, in any event, Jordan's memorandum merely reflected his understanding that coverage under the ongoing operations endorsement applies to property damage occurring before the completion of Martinez's and Rozema's

14

work, which was consistent with McMillin's interpretation of the endorsement in its opposition to Lexington's motion.

        f.  *Lexington's reply*

In its reply, Lexington reiterated its argument that "[s]ince as a matter of law McMill[i]n could not have had liability to the . . . plaintiffs ('Homeowners') until after the Homeowners took possession of their homes long after operations were complete, . . . liability cannot have arisen from ongoing operations." For example, Lexington argued, "The critical question in this case . . . is whether McMillin was liable to the Homeowners *during* Martinez['s] and/or Rozema's . . . ongoing operations." (Italics added.) Lexington then argued the answer to that question by stating, "McMillin had no liability to the Homeowners *during* Martinez'[s] and Rozema's ongoing operations because it is undisputed that the Homeowners took possession after all work had been completed." (Italics altered & boldface omitted.)

Lexington maintained that "[b]ecause the Homeowners in the [underlying action] could only sue for construction defect[s] after taking possession of their homes, and after all work had been completed, the word 'liability' in the [additional insured] endorsements must encompass a temporal element." Lexington made clear that, under its interpretation of the endorsements, McMillin had no possible coverage for construction defect claims, since such claims would accrue to homeowners only after the homeowners took possession of the homes and all of Martinez's and Rozema's work was complete. Lexington argued:

"Here, it is undisputed that [the underlying action] involves construction defect claims[ ] [citation] and that the subject [additional insured] endorsements limit coverage for the [additional insured] to liability arising out of Martinez's and Rozema's ongoing operations performed [for] McMillin. [Citation.] Accordingly, there is no coverage for McMillin under the ongoing operations [additional insured] endorsements and Lexington owed no duty to defend McMillin."

g. *The trial court's ruling*

After hearing argument from counsel, the trial court issued a ruling granting Lexington's motion for summary judgment. The court reasoned in relevant part:

"The additional insured endorsements ('AIE') provide[ ] coverage 'only with respect to liability arising out of [the subcontractors'] *ongoing operations*.' [Citation.] Because there were no homeowners in existence until after the subcontractors' work was completed, it follows that . . . any potential liability to the homeowners arising out of the subcontractors' work must have arisen out of the subcontractor's *completed operations*." (Italics added.)

The trial court reasoned further that "[t]here is a distinction between ongoing operations and completed operations coverage." (Citing *Pardee Const. Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1340–1345 (*Pardee*).)

After an extensive discussion of *Pardee*, the trial court stated:

"Moreover, McMillin itself has acknowledged that [additional insured endorsement] coverage for ongoing operations ends when the subcontractor's work is completed. [Citation.][4] [¶] [McMillin's] interpretation would also run afoul of the rule that

4    In support of this point, the trial court cited to two undisputed material facts referencing the May 2003 Jordan memorandum discussed in part II.B.1.d, *ante*, that stated in relevant part, "In other words, the coverage for the Additional Insured ends when the subcontractor's work is no longer ongoing . . . or, in other words, is finished or completed . . . ." (Italics omitted.)

16

insurance contracts must be construed to avoid rendering terms surplusage. [Citation.] McMillin contend[s] the endorsement provides coverage as long as liability arose out of the subcontractors' work. [McMillin] fail[s] to give any meaning to the phrase 'ongoing operations.' "

2. *Governing law*

   a. *Applicable principles of law governing the interpretation of an insurance policy*

In *Hartford*, *supra*, the Supreme Court outlined the following relevant law governing the interpretation of an insurance policy:

"In determining whether a claim creates the potential for coverage under an insurance policy, 'we are guided by the principle that interpretation of an insurance policy is a question of law.' [Citation.] 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.)' [Citation.] In determining this intent, '[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.' [Citation]. We consider the ' "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' [Citation.] We must also 'interpret the language in context, with regard to its intended function in the policy.' " (*Hartford*, *supra*, 59 Cal.4th at p. 288.)

   b. *The meaning of the key terms in the endorsement*

As discussed in part III.B.1.b.iii, *ante*, Lexington named McMillin as additional insured for " 'liability arising out of [Martinez's or Rozema's] ongoing operations performed for [McMillin].' "

17

### i. *Liability*

We assume for purposes of this decision that Lexington is correct that the meaning of the term "liability" in the endorsements is "loss and legal obligation for [the loss]."

### ii. *Arising out of*

In *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321 (*Syufy*), the Court of Appeal discussed the meaning of the phrase "arising out of," while interpreting an additional insured endorsement in a CGL policy. The *Syufy* court stated:

> "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." (*Id.* at p. 328.)

### iii. *Ongoing operations*

In *St. Paul Fire and Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1056–1057 (*St. Paul*), the court interpreted an additional insured endorsement that, as in this case, provided coverage limited " 'to liability [to [the additional insured]] arising out of [named insured's] ongoing operations performed for [the additional insured].' " (*Id.* at p. 1055.) The *St. Paul* court stated that the term "ongoing operations" was "the work to be performed for [the additional insured] under the [s]ubcontract," by the named insured. (*Id.* at pp. 1056–1057.)

### 3. *Application*

In order to resolve this appeal, we are faced with a narrow question. Did the trial court properly determine that there was no potential for coverage under the endorsements

18

naming McMillin as an additional insured for " 'liability arising out of [Martinez's or Rozema's] ongoing operations performed for [McMillin]' " because there were no homeowners in the Project at the time of Martinez's and Rozema's ongoing operations?

Lexington contends that the answer to that question is "yes," and that we may affirm the judgment on this basis. As it argued in the trial court, Lexington contends that the fact that there were no homeowners at the time Martinez and Rozema were working on the Project establishes that McMillin did not have any liability to the homeowners *during* Martinez's and Rozema's ongoing operations. Lexington repeats this contention throughout its brief:

> "The trial court correctly ruled that McMillin did not have any liability to the Homeowners *during* 'ongoing operations' because there were not Homeowners until after operations were completed." (Italics altered.)

> "In other words, the determinative issue is whether McMillin's potential liability to the Homeowners arose *during* a named insured's 'ongoing operations.' " (Italics added.)

> "On these facts, since the Homeowners' causes of action accrued after operations were completed, McMillin could have no liability to the Homeowners *during* the named insureds' 'ongoing operations.' " (Italics altered.)

> "[T]he central question here is whether McMillin faced any liability to the Homeowners *during* the named insureds' 'ongoing operations,' . . . ." (Italics added.)

> "Under the terms of the Lexington [additional insured] [e]ndorsements, McMillin could have coverage for liability for bodily injury or property damage when that liability arises *during* ongoing operations." (Italics added.)

> "The key issue is whether McMillin's liability arose *during* the named insureds' 'ongoing operations.' " (Italics added.)

19

"Specifically, the 'liability,' i.e., the loss and legal obligation for same, must take place *during* the named insured's ongoing operations." (Italics altered.)

Even assuming that Lexington is correct that McMillin did not face any liability to homeowners *during* Martinez's or Rozema's ongoing operations,[5] the endorsements do not state that Lexington would provide coverage solely for liability occurring *during* Martinez's or Rozema's ongoing operations performed for McMillin. Rather, the endorsements state that Lexington would provide coverage to McMillin for liability "*arising out of*" such ongoing operations. The term "arising out of" is, of course, not synonymous with "during." (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey* (8th Cir. 1984) 726 F.2d 1286, 1290 [rejecting interpretation of agreement that "would require reading the words 'arising out of' as synonymous with 'during' "].)

Indeed, as discussed above, the phrase "arising out of," has specifically been given a "broad interpretation," in the context of additional insured endorsements. (See *Syufy*, *supra*, 69 Cal.App.4th at p. 328.) The term "arising out of" in the endorsements granting McMillin coverage for " 'liability arising out of [Martinez's or Rozema's] ongoing operations,' " provides only that McMillin's liability must be "linked," through a "minimal causal connection or incidental relationship" (*ibid.*), with Martinez's or Rozema's ongoing operations. Thus, the fact that there were no homeowners at the time of Martinez's and

---

5      We emphasize that we do not conclude that Lexington would have been entitled to summary judgment if the endorsements restricted coverage to liability occurring *during* ongoing operations.

20

Rozema's ongoing operations does not establish that McMillin could suffer no liability *arising out of* such ongoing operations.

For example, consider the work of Lexington subcontractors such as those in this case, who performed concrete flatwork and stucco work. The improper pouring of concrete on a foundation or the improper installation of stucco could permit water damage to other portions of the home.[6] Thus, consequential damage could begin long before the subcontractors' work ended. If homeowners did not discover and file suit to recover for such damages until after the subcontractors ceased ongoing operations, that would not establish that McMillin suffered no liability *arising out of* such ongoing operations.[7]

Both Lexington and the trial court have focused on the terms "ongoing operations" and "completed operations" in tandem, suggesting that any claim by a homeowner is necessarily covered, if at all, only by "completed operations" coverage. Lexington appears to suggest that an "ongoing operations" additional insured endorsement does not

---

[6] We emphasize that we mention such potential damages by way of example for illustrative purposes and not to in any way suggest that this is the basis of the potential coverage in this case.

[7] In *Pulte Home Corp. v. American Safety Indemnity Co.* (2017) 14 Cal.App.5th 1086, this court made a similar point in affirming a judgment against an insurer (American Safety) for breaching its duty to defend a general contractor named as an additional insured on several CGL policies issued to its subcontractors:

> "American Safety incorrectly focuses on when the current property owners became financially damaged through purchases. This begs the question of when the subject property damage occurred from the work of the subcontractors. The coverage potential depends on when the property became physically damaged." (*Id*. at. p. 1113.)

afford the additional insured with coverage provided under a named insured subcontractor's "products-completed" coverage.

The policies in this case state that " 'property damage' " covered under the " 'products-completed operations hazard' " does *not* include the named insured subcontractors' "[w]ork that has not yet been completed or abandoned." Thus, the policy language makes clear that property damage occurring *before* completion of the named insured subcontractors' work would not be covered by "products-completed operations hazard."[8]

As our example above demonstrates, the lack of homeowners does not establish that any property damage caused by the named insured subcontractors' work occurred *after* the completion of their work. Thus, even assuming that Lexington is correct that an "ongoing operations" additional insured endorsement does not provide the additional insured with the same coverage afforded under a named insured subcontractor's "products-completed" coverage, a homeowner's construction defect claim is not, as Lexington suggests in its brief, necessarily one that is brought to recover under the "products-completed" coverage of a named insured subcontractor's policy. On the contrary, if property damage occurs before the named insured finishes work at the jobsite,

_____

[8] One prominent commentator explains that "[t]he 'products-completed operations hazard' covers liability for accidental bodily injury or property damage *following completion* of the insured's work or operations. This type of coverage is generally conditioned on damage occurring during the policy period, *as long as the work was completed before the damage occurred* . . . ." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2017) ¶ 7:1429, p. 7E-27 (second italics added).) Thus, "products-completed" coverage only covers damage that occurs *after* the named insured completes operations.

under the plain language of the policy, an additional insured may be entitled to coverage pursuant to an "ongoing operations" endorsement.[9]

This court's decision in *Pardee*, *supra*, 77 Cal.App.4th 1340, on which both the trial court and Lexington heavily rely, does not support a contrary result. In *Pardee*, we concluded that several insurers that had issued CGL policies to subcontractors, including "*completed* operations coverage as to *projects completed before [the policies'] inception*," owed a duty to defend an additionally insured general contractor in third party litigation alleging vicarious liability for the subcontractors' acts in constructing the completed projects. (*Id.* at pp. 1344–1345, italics added.) In the course of reaching this conclusion, the *Pardee* court noted that if the insurers had wished to exclude coverage for "projects *completed before inception of policies*" (*id.* at p. 1358), the insurers had several options:

> "The insurers could have limited coverage by express policy language that coverage was limited to claims arising from work performed during the policy period. However, they did not. Indeed, they acknowledge they intended to provide the named insureds completed operations coverage for projects completed before inception of policies. Similarly, the insurers could have used the form 2009 additional endorsement, which has been widely employed since the mid-1980's to add a contractor as an additional insured under a subcontractor's policy and which clearly excludes 'completed operations.' Again, they did not." (*Id.* at p. 1358, fn. omitted.)

The *Pardee* court stated that, alternatively, the insurers could have used additional insured endorsements that restricted coverage to the ongoing operations of the named

---

9       As discussed in the text, *post*, we need not, and do not, decide whether an additional insured is entitled to coverage under an "ongoing operations" endorsement where the property damage occurs *after* the named insured finishes work at the jobsite but before the termination of the policy.

23

insured.  (*Pardee*, *supra*, 77 Cal.App.4th at p. 1359.)  The *Pardee* court detailed the

history of the availability of such endorsements as follows:

> "[I]n 1993, the Insurance Services Office (ISO)[10] revised the
> language of the form 2010 endorsement utilized by the insurance
> industry to expressly restrict coverage for an additional insured to
> the 'ongoing operations' of the named insured.[ ]  This revised
> language effectively precludes application of the endorsement's
> coverage to completed operations losses.  [Citation.]  One insurance
> commentator stated regarding the 1993 revisions of the standard
> additional insured endorsement forms:  'The restriction of coverage
> in the two endorsements to only ongoing operations makes it clear
> that additional insureds will have no coverage under the named
> insured's policy for liability arising out of the products-completed
> operations[11] exposure. . . .  The effect of this change—restricting
> the coverage to ongoing operations—is, however, much more
> profound on [form 2010].  Previous editions of [that form] contained
> no completed operations exclusion and, thus, could be called on to
> cover an additional insured for liability arising out of the products-
> completed operations hazard.'  [Citation.]  Similarly, construction
> industry and underwriting spokespersons have echoed this
> assessment:  'Completed Operations Coverage.  Prior to the 1993 . . .
> revisions, the standard ISO additional insured endorsements
> provided the additional insured with coverage for liability arising out
> of "your operations performed for" the additional insured, which
> included completed operations.  More recent editions of these
> endorsements provide coverage only with respect to "your ongoing

---

10    In a footnote at this portion of the quotation, the *Pardee* court described the ISO as
follows:

> " 'ISO is a nonprofit trade association that provides rating, statistical,
> and actuarial policy forms and related drafting services to
> approximately 3,000 nationwide property or casualty insurers.
> Policy forms developed by ISO are approved by its constituent
> insurance carriers and then submitted to state agencies for review.
> Most carriers use the basic ISO forms, at least as the starting point
> for their general liability policies.' "  (*Pardee*, *supra*, 77 Cal.App.4th
> at p. 1359.)

11    "[P]roducts-completed operations coverage applies to defects in merchandise or
improper workmanship after the product has been completed and distributed."  (*Travelers
Casualty & Surety Co. v. Employers Ins. of Wausau* (2005) 130 Cal.App.4th 99, 113.)

24

operations," which effectively eliminates coverage for completed operations.' [Citation.] Although these 1993 revisions postdated the insurers' policies here with the exception of [one insurer], they evince as to [the other insurers] alternative express limiting language that could have been employed. [¶] Consequently, the insurers' failure to use available language expressly excluding completed operations coverage implies a manifested intent not to do so." (*Id.* at pp. 1358–1359.)

Since the *Pardee* court was discussing how the insurers in that case could have restricted coverage "for projects completed before inception of [the] policies" (*Pardee, supra,* 77 Cal.App.4th at p. 1358), *Pardee* supports the proposition that an ongoing operations endorsement may be used by an insurer to make clear that there is no coverage for damages arising out of work completed *prior to the inception of the policy.* (See also *id.* at p. 1358 ["insurers could have limited coverage by express policy language that coverage was limited to claims arising from work performed *during the policy period*" (italics added)].) It is undisputed in this case that Lexington did not establish that the damages in this case arose from work completed *before the inception of the policies.*

Moreover, even assuming that an ongoing operations additional insured endorsement may have a broader effect (e.g., by restricting coverage to damages that occur before the completion of the subcontractors' ongoing operations), *the trial court did not conclude that Lexington had established as a matter of law that all of the property damage in the underlying action occurred only after the completion of the Martinez's and Rozema's ongoing operations.*[12] Lexington does not argue to the contrary on appeal.

---

[12] Coverage for property damage under an occurrence based CGL policy, such as the policies in this case, is deemed "to occur over the entire process of the continuing injury,"

25

Instead, it contends, "The relevant issue is when liability arose, not when property damage first commenced."[13]

The parties have not cited, and our own research has not uncovered, any relevant California authority specifically addressing whether an ongoing operations additional insured endorsement such as the one in the Lexington policies provides coverage to the additional insured only for damages that occur before the completion of the named insured's ongoing operations. Cases from other jurisdictions are in conflict on this issue. (Compare e.g., *Noble v. Wellington Assocs.* (Miss. 2013) 145 So.3d 714, 720 ["endorsement did not cover property damage manifesting[14] itself after [subcontractor named insured] stopped working on the site"] with *Tri-Star Theme Builders, Inc. v OneBeacon Ins. Co.* (9th Cir. 2011) 426 Fed.Appx. 506, 508 (*Tri-Star*) [rejecting

---

and not simply when the damage is discovered or becomes manifest. (*Pepperell v. Scottsdale Ins. Co.* (1998) 62 Cal.App.4th 1045, 1053 (*Pepperell*).) Given that damages from construction defects often consist of "a continuing and progressively deteriorating process" (*id.* at p. 1055), damages may occur during a subcontractors' ongoing operations, only to be discovered at a far later time. (See, e.g., *id.* at pp. 1048–1049, 1054–1055 [construction defect complaint that alleged defective roof design and construction that was completed by November 1988 alleged potentially covered damages, despite fact that policy terminated in 1989 and defects were not discovered until severe leakage occurred in 1991].)

13    In addition, Lexington does not contend that it presented evidence that established as a matter of law that the *exclusions* contained in the additional insured endorsements related to the timing of the occurrence of property damage applied. (See pt. III.B.1.b.iii, *ante* ["This insurance does not apply to . . . 'property damage' occurring after:  (1) All work . . . at the site of the covered operations has been completed; or (2) That portion of 'your work' out of which the injury or damage arises has been put to its intended use . . . ."].)

14    *Noble* is also distinguishable because, as discussed in footnote 12, *ante*, California law does *not* require that property damage become "manifest" in order to trigger coverage under a CGL policy. (*Pepperell*, *supra*, 62 Cal.App.4th at p. 1052.)

26

insurer's contention that additional insured general contractor was "covered [only] for damages suffered while [named insured subcontractor] was performing work on the [p]roject"].)

However, we need not decide this issue in this appeal, because Lexington has not established as a matter of law that all of the damages in the underlying action occurred after the completion of Martinez's and Rozema's ongoing operations. Rather, as discussed above, we need decide only whether Lexington and the trial court are correct that the nonexistence of homeowners at the time Martinez and Rozema ceased ongoing operations establishes as a matter of law the lack of potential for coverage for McMillin under the policies. On this issue, neither the *Pardee* court, nor any other case that Lexington has cited or of which we are aware, has held that the fact that there were no homeowners at the time the named insured subcontractor ceased ongoing operations demonstrates that an additional insured did not suffer liability arising out of the named insured's ongoing operations. The one out-of-state case that Lexington cites, without discussion, that comes closest to stating as much, *Hartford Ins. Co. v. Ohio Cas. Ins. Co.* (2008) 145 Wash.App.765, 780 (*Ohio*), relied on *Pardee* only in reaching the conclusion that an insurer was "correct in its argument that the additional insured endorsement 'limited [the additional insured's] coverage to *property damage arising out of the subcontractors' work in progress* only.' " (*Ohio*, *supra*, at p. 778, italics added.)[15] As

---

[15]     The *Ohio* court suggested that the additional insured *would have* had coverage "[i]f there were allegations in the complaint [in the underlying construction defect action] or other evidence that would have shown that [the insurer] was being asked to cover [the

discussed above, we need not resolve the conflict in the non-California case law[16] concerning this issue because Lexington did *not* establish that all of the damage in the underlying action occurred after Martinez and Rozema completed operations.

We acknowledge that the *Ohio* court did conclude that an insurer had no duty to defend the additional insured in that case, in part, because "the condo owners did not own the units until after the completion of subcontractor operations." (*Ohio*, *supra*, 145 Wash.App. at p. 780.) However, the *Ohio* court did not cite *Pardee* as support for this portion of its analysis (*Ohio*, *supra*, at p. 780) nor did the court explain why it viewed this fact as establishing that there was no possibility for coverage under a policy that provided that "the additional insured was an insured only with respect to '[the named insured's] ongoing operations for that insured, whether the work is performed by [the named insured] or for [the named insured].' " (*Id.* at p. 777.) For the reasons stated above, the fact that there were no homeowners in the Project at the time Martinez and Rozema ceased ongoing operations does not logically establish that the complaint in the underlying action did not subject McMillin to potential " 'liability *arising out of* [Martinez's or Rozema's] ongoing operations performed for [McMillin].' " (Italics added.) In short, neither *Pardee*, nor the text of the endorsements, provide any support for the trial court's order or Lexington's contention on appeal.

___

additional insured] for liability arising from work in progress . . . ." (*Ohio*, *supra*, 145 Wash.App. at p. 780, italics added.)

[16] The Ninth Circuit has distinguished *Ohio* (*Tri-Star*, *supra*, 426 Fed.Appx. at p. 512) and criticized a portion of its reasoning (*Id.* at p. 514).

Lexington's argument that we may affirm the judgment on the ground that McMillin's interpretation of the endorsement would render the term "ongoing" surplusage also fails. Lexington contends that we may affirm the judgment on this ground because McMillin purportedly argues that it is entitled to coverage for claims arising out of the subcontractors' completed operations, "since even 'completed operations' (under McMillin's argument) arise out of operations which were, at some point, ongoing."[17] Even assuming that McMillin is making this argument, we reverse the judgment solely on the narrow ground that the fact that there were no homeowners at the time Martinez and Rozema ceased ongoing operations does not establish as a matter of law the lack of a potential for coverage for McMillin under the policies. As explained above, we do not decide whether an ongoing operations endorsement such as that used in this case provides coverage to the additional insured only for damages that occur prior to the completion of the named insured's subcontractors' ongoing operations.[18]

We also reject Lexington's argument that we may affirm the judgment on the ground that the May 2003 Jordan memorandum demonstrates that McMillin understood that the endorsements would provide no coverage for the claims in the underlying action. Even assuming that the Jordan memorandum is properly considered as extrinsic evidence

---

[17] We quote from Lexington's respondent's brief.

[18] One can imagine that damage from a subcontractor's ongoing operations might occur either *prior to* the completion of ongoing operations (e.g., a poorly installed pipe that causes a leak that begins to cause water damage to drywall while the subcontractor continues to work on the project, but that is not discovered until the home is purchased) or *after* the completion of ongoing operations (e.g., a poorly installed pipe that causes a leak that begins to cause water damage to drywall after the subcontractor ceases operations).

of the parties' understanding of the endorsements, the Jordan memorandum merely states, "[c]overage for the Additional Insured ends when the subcontractor's work is no longer ongoing . . . or, in other words, is finished or completed . . . ."  (Italics omitted.)  Since homeowners are not mentioned in the cited portion of the Jordan memorandum, the memorandum does not constitute evidence that McMillin believed that the fact that there were no homeowners during the subcontractor's ongoing operations demonstrated that McMillin would have no potential coverage for construction defect claims under the endorsements.[19]

Accordingly, we conclude that the trial court erred in granting Lexington's motion for summary judgment.[20]

---

[19] We are not persuaded by Lexington's contention that we may affirm the judgment on the basis that McMillin failed to address the surplusage interpretation issue and the Jordan memorandum issue in its opening brief.  While Lexington asserts that these issues are "*independent* grounds," upon which the trial court granted summary judgment, in fact, they are not.  (Italics added.)  The trial court's reasoning with respect to both issues was *related* to the sole ground on which the court granted summary judgment, namely, that Lexington established that it had no duty to defend McMillin in the underlying action because there was no possibility for coverage under the policies given the " 'ongoing operations' " limitation in the additional insured endorsements.  McMillin adequately addressed this issue in its opening brief, and Lexington is not entitled to affirmance merely because McMillin did not address in its opening brief every aspect of the court's reasoning in granting summary judgment.

[20] In its respondent's brief, Lexington raises two claims under separate headings that we need not consider in this appeal.  Specifically, Lexington contends that it is entitled to "summary adjudication of McMillin's claim for bad faith."  Lexington also maintains that McMillin is "not entitled to punitive damages."  (Capitalization & boldface omitted.)  Neither claim constitutes a basis for affirming the trial court's order granting *summary judgment* in favor of Lexington.  We therefore express no opinion with respect to either issue.

C. *The trial court properly granted Financial Pacific's motion for summary judgment*

McMillin claims that the trial court erred in granting Financial Pacific's motion for summary judgment. McMillin argues that the allegations in the underlying action and additional facts known to Financial Pacific established the potential for coverage under Financial Pacific's policies issued to A.M. Fernandez and J.Q. Drywall, and thus triggered Financial Pacific's duty to defend McMillin as an additional insured under those policies.

Specifically, McMillin contends that the homeowners in the underlying action complained of damages related to *stucco* installation and that there is evidence in the record that J.Q. Drywall performed stucco work. McMillin also claims that Financial Pacific had knowledge of facts extrinsic to the complaint in the underlying action that demonstrated that the homeowners were potentially seeking damages related to *drywall* installation covered under the policies.

1. *Additional factual and procedural background*

Financial Pacific filed a motion for summary judgment in which it contended that it did not owe McMillin a duty to defend the underlying action. Financial Pacific argued that there were no allegations in the complaint in the underlying action identifying either A.M. Fernandez or J.Q. Drywall or "their work furnishing and installing drywall in the homes." Financial Pacific further maintained that the homeowners in the underlying action had made "no contention in their complaints or defect list that they had suffered damage to other property [i.e., other than the drywall] due to A.M. Ferndandez . . . or J.Q. Drywall's work." Financial Pacific maintained that damages related to the drywall on

31

which its insureds were working did not constitute covered property damage under the policies.

In its opposition, McMillin contended that Financial Pacific was aware of facts that gave rise to the potential for covered damages resulting from Financial Pacific's insured's work. Specifically, McMillin cited to a notice of claim and a defect list submitted by the homeowners in the underlying action that McMillin argued supported the conclusion that improper drywall or stucco installation[21] may have led to water intrusion into the homes and damage to parts of the homes other than the drywall or stucco.

Financial Pacific filed objections to the evidence that McMillin offered in support of its contention that J.Q. Drywall had performed stucco installation work on the Project.

After further briefing and a hearing, the trial court granted Financial Pacific's motion for summary judgment on the ground that Financial Pacific had established that it did not owe McMillin a duty to defend the underlying action. As discussed below, in its order granting Financial Pacific's motion, the court sustained Financial Pacific's objections to McMillin's evidence offered in support of its contention that Financial Pacific's insured had performed *stucco* installation. As to the merits of the motion, the trial court noted that Financial Pacific issued policies to A.M. Fernandez and J.Q.

---

21    As discussed below, McMillin argued that one of Financial Pacific's insureds, J.Q. Drywall, had performed *stucco* installation on the Project based on evidence that the trial court later deemed inadmissible.

Drywall that covered consequential property damage[22] and that McMillin was named as an additional insured on the policies. The trial court agreed with Financial Pacific that it had established that there was no potential for coverage in the underlying action and that Financial Pacific had established that it did not owe McMillin a duty to defend. The court reasoned in part:

"As in *Monticello*,[23] the complaints [in the underlying action] did not mention drywall or any problems caused by the installation of the drywall. The only damages the homeowners attributed to subcontractors' work was "drywall and corner bead cracks and separation' and 'drywall nail pops.' [Citation]. There is no reference to any damages the installation caused to other property.

"McMillin cites to the homeowners' defect list submitted in April 2010 as part of an SB 800 claim.[24] [Citation.] The cited portions refer to water intrusion in connection with windows, patio doors and deck doors, and improper installation of moisture barriers at doors, windows and sliding glass doors. [Citation.] McMillin also cites to drywall separation, window weeps clogged with stucco, drywall nail pops, and stains from water intrusion listed in revised SB 800 claims. [Citation.] The subcontractors were hired to install drywall. There is no evidence that the subcontractors were responsible for installing windows and patio doors. There is also no indication that

---

22    The court explained that under California law, the meaning of "property damage," under the policy did not "cover claims that the work itself is defective," and that covered property damage did not exist "unless and until the defective component causes physical injury to tangible property in at least some other part of the system." (Quoting *F & H Construction v. ITT Hartford Ins. Co.* (2004) 118 Cal.App.4th 364, 373.) Damage to property *other* than the property worked on by the insured is commonly referred to as "consequential property damage or resultant property damage . . . ." (*Monticello Ins. Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1379 (*Monticello*).

23    We discuss *Monticello* in part III.C.3 and part III.C.4, *post*.

24    "SB 800" refers to Senate Bill 800, which, in 2002, adopted the Right to Repair Act (Civ. Code, § 895 et seq.). The Right to Repair Act "establishes a set of building standards pertaining to new residential construction and provides homeowners with a cause of action . . . for a violation of the standards (§§ 896, 936)." (*Acqua Vista Homeowners Assn. v. MWI, Inc.* (2017) 7 Cal.App.5th 1129, 1134.)

33

the homeowners claimed the drywall damaged other property. The water intrusion issues McMillin references were attributed to issues with windows and doors."

2. *Additional law governing an order granting summary judgment*

Where a party fails to challenge on appeal an evidentiary ruling sustaining an objection to evidence, a reviewing court must "consider . . . such evidence to have been properly excluded." (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 (*Lopez*) [where party fails to "challenge the trial court's ruling sustaining . . . objections to certain evidence offered in opposition to the summary judgment motion," "any issues concerning the correctness of the trial court's evidentiary rulings have been waived"].) A party is not entitled to reversal on the basis of inadmissible evidence. (See *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 529 ["A motion for summary judgment 'must be decided upon admissible evidence' "].)

3. *Additional relevant law concerning covered property damage and the duty to defend*

In *Monticello*, *supra*, 162 Cal.App.4th 1376, the Court of Appeal considered whether the trial court erred in denying a plaintiff insurer (Monticello) summary judgment in an equitable contribution action for defense costs against a second insured (Essex). (*Id.* at pp. 1378, 1381–1383.) Monticello claimed that Essex had a duty to defend a general contractor against construction defect claims as an additional insured to a policy issued to a subcontractor that had installed drywall on the property at issue in the underlying construction defect action. (*Id.* at p. 1378.) Monticello contended that the pleadings in the underlying case established a possibility of consequential property

34

damage related to the drywall installer's work sufficient to trigger Essex's duty to defend. (*Id.* at pp. 1386–1387.)

In considering this claim, the *Monticello* court noted that the homeowner plaintiffs in the underlying case alleged " '[e]xcessive cracking in the interior and exterior of the . . . property,' " " '[p]remature failure of painted surfaces,' " and " '[w]ater damage to structure.' " (*Monticello*, *supra*, 162 Cal.App.4th at p. 1387.) The *Monticello* court concluded that the "excessive cracking" allegation did not reveal a possibility of coverage under the drywall installer's policy, reasoning:

"*The word 'drywall' is not even mentioned in the underlying complaint.* There was no allegation therein that the 'excessive cracking' was in any way related to the work of [the drywall installer] or to any drywall installation. 'Cracking' and 'drywall' are not synonymous. Essex was not required to speculate that the 'excessive cracking' might be attributed to the work of [the drywall installer]." (*Ibid.*)

The *Monticello* court also reasoned, "As for the allegations in . . . the complaint relating to 'premature failure of painted surfaces' and 'water damage to structure,' the complaint did not allege those damages were in any way related to drywall work." (*Monticello*, *supra*, 162 Cal.App.4th at p. 1387.) Ultimately, the *Monticello* court concluded that the complaint did not reveal a possibility that the action against the general contractor might be covered by the drywall installer's policy. (*Ibid.*)

4. *The trial court properly concluded that Financial Pacific did not owe McMillin a duty to defend the underlying action*

McMillin contends that both the allegations in the underlying action and facts extrinsic to the complaint in the underlying action established the possibility of consequential damages arising from the work of Financial Pacific's insureds, A.M. Fernandez and J.Q. Drywall.

With respect to the allegations in the underlying action, McMillin contends that the homeowners complained of defects related to *stucco* that permitted unintended moisture to enter the homes. McMillin also asserts in its opening brief on appeal that one of Financial Pacific's insureds, J.Q. Drywall, performed stucco work on the project. McMillin argues:

36

"In their SB800 Written Notice of Claim,[25] the homeowners specifically alleged construction defects including 'improper installation of foundations, slabs, flatwork . . . gaps and missing plaster in stucco system, . . . stucco cracking allowing unintended moisture, . . . improper soil preparation and installation of exterior flatwork.' [Citation.] *Financial Pacific's named insured, J.Q. Drywall performed stucco work on the Project.* (7 CT 1778-81, 1857, 1862, 1864, 1866, 1868–69.)" (Italics added.)

Notwithstanding its assertion in its opening brief that J.Q. Drywall performed stucco work on the Project, McMillin fails to identify any admissible evidence in the record demonstrating this fact. Specifically, the only evidence that McMillin cites in support of its contention that J.Q. Drywall performed stucco work on the Project is the declaration of McMillin's employee, Les Leininger, authenticating various "Job Cost Detail Reports," purportedly showing that J.Q. Drywall performed stucco work on the Project and the Job Cost Detail Reports themselves. However, McMillin fails to address, in any manner, the trial court's *sustaining* of Financial Pacific's objections to the paragraphs of the Leininger declaration authenticating the Job Cost Detail Reports.

The trial court's summary judgment order states, "[Financial Pacific's] objections to paragraphs 6-9 of Les Leininger's declaration are sustained." While the citations in

---

25     Although not material for purposes of this appeal—since a duty to defend may arise from facts extrinsic to the pleadings in the underlying action (see *Hartford*, *supra*, 59 Cal.4th at p. 287)—we note that while McMillin refers to this document in a section of its brief entitled "[t]he allegations in the [underlying action]," it does not present any authority in support of its suggestion that a SB800 Written Notice of Claim may properly be considered as such.

McMillin's brief are to Leininger's *amended* declaration, paragraphs six through nine in *both* Leininger's original and amended declarations authenticate the same Job Cost Detail Reports,[26] and there is no indication in the record that the trial court considered paragraphs six through nine of the *amended* declaration and the accompanying Job Cost Detail Reports to be admissible.

Indeed, the trial court's remarks at the summary judgment hearing, which took place *after* McMillin filed Leininger's amended declaration,[27] indicate that the court ruled that paragraphs six through nine of the amended declaration, and the accompanying Job Cost Detail Reports, were inadmissible. Specifically, at the hearing, after the trial court questioned whether there was any evidence that the Job Cost Detail Reports had been available "earlier,"[28] McMillin's counsel provided a lengthy argument concerning the admissibility of the Job Cost Detail Reports. Thereafter, Financial Pacific's counsel stated, "I didn't know how much to talk about these job cost detail reports." The trial court responded, "I sustained the objections and I haven't heard anything that would change my mind."

---

26     The declarations differed in that Leininger's amended declaration referred to relevant *excerpts* of the Job Cost Detail Reports pertaining to A.M. Fernandez and J.Q. Drywall, while the original declaration referred to the entirety of all of the Job Cost Detail Reports submitted with the original declaration.

27     McMillin filed the amended declaration on October 23, 2015, and the trial held the summary judgment hearing seven days later on October 30.

28     Earlier in the hearing, McMillin's counsel stated that the "impression that I get from the [tentative] ruling is that the Court believes that [the Job Cost Detail Reports were] never available to Financial Pacific at the time of the tender."

38

Notwithstanding this record, McMillin fails to present *any* argument on appeal that this court may properly consider the Leininger amended declaration and the accompanying Job Cost Detail Reports in reviewing the trial court's summary judgment order. Under these circumstances, we agree with Financial Pacific's contention that McMillin's "fail[ure] to say a single word in its Opening Brief about the trial court's evidentiary ruling," forfeits any contention that we may properly consider such evidence on appeal. [29] (*Lopez*, *supra*, 98 Cal.App.4th at pp. 1014–1015 [party forfeits challenge to trial court's exclusion of evidence in summary judgment proceeding by failing to raise claim on appeal that trial court erred in excluding evidence]; see *Bains v. Moores* (2009) 172 Cal.App.4th 445, 455 [appellant has burden of demonstrating trial court erred in granting summary judgment motion].)

McMillin also contends that the trial court erred in relying on *Monticello* because "[t]he allegations of construction defects in the . . . complaint [in the underlying action] did not eliminate the possibility of resultant damage from those defects and did not defeat Financial Pacific's duty to defend." McMillin reasons, "*Monticello* does not control here because 'gaps and missing plaster in stucco system, . . . [and] stucco cracking allowing unintended moisture,' are related to stucco in a way that 'excessive cracking' and 'drywall' are not." However, without admissible evidence that J.Q. Drywall performed stucco work, McMillin's attempt to distinguish *Monticello* is unpersuasive.

---

[29]    Further, despite Financial Pacific's extensive discussion of this issue in its respondent's brief, McMillin did not discuss the issue in its reply brief.

McMillin also raises several arguments in support of its contention that the trial court erred in determining that Financial Pacific did not have knowledge of any facts extrinsic to the complaint in the underlying action that established the potential for coverage. First, McMillin argues that the trial court "concluded that the defect list information acquired by Financial Pacific after it decided to reject the tender is irrelevant . . . ." The trial court reached no such conclusion. On the contrary, as quoted above (see pt. III.C.3, *ante*), the trial court expressly considered whether the homeowners' defect lists provided to Financial Pacific in connection with the homeowners SB 800 claims established the possibility of coverage. The trial court concluded that the defects on the list on which McMillin relied in opposing the motion for summary judgment referred to damages resulting from work that the drywall subcontractors had *not* completed (i.e., "[t]here is no evidence that the subcontractors were responsible for installing windows and patio doors"), and did not demonstrate that any of the work that the subcontractors *had* performed resulted in damages (i.e., "[t]here is also no indication that the homeowners claimed the drywall damaged other property"). On appeal, McMillin fails to establish error with respect to either conclusion. (See *Monticello*, *supra*, 162 Cal.App.4th at p. 1387 [concluding insurer owed no duty to defend under liability policy issued to drywall installer where consequential damages referred to in the complaint were not alleged to have been related to work of the drywall installer].)

McMillin also fails to address the trial court's conclusion that Financial Pacific presented evidence in support of its motion for summary judgment by way of McMillin's responses to special interrogatories that established that McMillin had no evidence of potential consequential damages resulting from defective drywall installation. Specifically, when asked to "identify the damage alleged [to have resulted] from [Financial Pacific's named insured's] work," McMillin stated only, " 'drywall and corner bead cracks and separation,' " and " 'drywall nail pops.' "  As the trial court properly concluded in citing these responses, "[t]here is no reference to any damage the installation caused to other property."

Finally, McMillin repeatedly suggests in its brief on appeal that Financial Pacific's alleged failure to perform an adequate investigation into the potential for coverage under the policies demonstrates that it breached its duty to defend.  For example, McMillin argues, "Financial Pacific made no investigation of the defect allegations or any extrinsic facts before deciding to deny coverage."  However, McMillin fails to point to any evidence demonstrating that such an investigation would have revealed a potential for coverage.[30]  Under these circumstances, any inadequacy of Financial Pacific's investigation cannot create a duty to defend where none existed.  (See *American Internat.*

---

[30]     While McMillin suggests that a reasonable investigation would have revealed the Job Cost Detail Reports demonstrating that J.Q. Drywall performed stucco work, we concluded in the text above that McMillin has forfeited any contention that the trial court erred in excluding the evidence pertaining to the Job Cost Detail Reports by failing to challenge the trial court's ruling on appeal.  Absent admissible evidence of the Job Cost Reports, McMillin cannot demonstrate that Financial Pacific would have discovered such reports if it had performed an adequate investigation.

41

*Bank v. Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558 (*American Internat. Bank*).)

As the *American Internat. Bank* court explained:

> "AIB contends that whether or not Fidelity had a duty to indemnify, as an insurer it had a duty to thoroughly investigate AIB's claim before rejecting it. . . .  As we understand it, AIB believes that a failure to conduct a reasonable investigation must result in imposition of liability on the insurer for defense costs whether or not a reasonable investigation would have revealed liability or potential for coverage.

> "AIB misunderstands the insurer's duty and the risk it runs if it fails to undertake an adequate investigation.  The risk that an insurer takes when it denies coverage without investigation is that the insured may later be able to prove that a reasonable investigation would have uncovered evidence to establish coverage or a potential for coverage."  (*Id.* at pp. 1570–1571.)

Accordingly, we conclude that the trial court properly granted Financial Pacific's motion for summary judgment on the ground that the undisputed evidence established that Financial Pacific did not owe McMillin a duty to defend the underlying action because there was no potential for coverage for McMillan under Financial Pacific's policies.[31]

---

[31]  McMillin also contends that two exclusions in Financial Pacific's policies do not preclude the possibility of coverage.  In addition, McMillin maintains that certain language in the relevant additional insured endorsements did not "preclude a defense duty."  (Capitalization omitted.)  The trial court did not grant summary judgment on the basis of either exclusion or the language in the endorsements.  Further, in light of our affirmance of the summary judgment on the ground stated in the text, we need not consider McMillin's arguments with respect to these issues.

IV.

DISPOSITION

The summary judgment in favor of Lexington is reversed.  The summary

judgment in favor of Financial Pacific is affirmed.

McMillin is entitled to recover its costs in its appeal from the summary judgment

entered in favor of Lexington.  Financial Pacific is entitled to recover its costs in

McMillin's appeal from the summary judgment entered in favor of Financial Pacific.


AARON, J.

WE CONCUR:

BENKE, Acting P. J.

DATO, J.