Filed 6/5/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MCMILLIN HOMES CONSTRUCTION, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>NATIONAL FIRE & MARINE INSURANCE COMPANY,<br><br>    Defendant and Respondent. | D074219<br><br><br>(San Diego County Super. Ct.<br> No. 37-2016-00007136-CU-IC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Timothy B. Taylor, Judge.  Reversed.

Ryan & Associates and Greg J. Ryan for Plaintiff and Appellant.

Summers & Shives, Martin L. Shives, and Peter B. Lightstone for Defendant and

Respondent.

A general contractor was covered as an additional insured on a commercial

general liability (CGL) policy issued to its roofing subcontractor.  The insurer refused to

defend the general contractor after it was sued by homeowners for construction defects

concerning roofing, prompting this lawsuit.  After a bench trial, the trial court concluded the insurer owed no duty to defend.  It believed the exclusion in the additional insured endorsement for damage to "property in the care, custody or control of the additional insured" precluded any duty to defend the general contractor in construction defect litigation.

The general contractor disputes the insurer's interpretation of the policy and asserts there was a duty to defend.  We agree and reverse the judgment.[1]  As judicially construed, the care, custody, or control exclusion requires exclusive or complete control. (*Home Indem. Co. v. Leo L. Davis*, *Inc.* (1978) 79 Cal.App.3d 863, 872 (*Davis*).)  The facts indicate only *shared* control between the general contractor and its roofing subcontractor.  Because the insurer did not prove coverage for the underlying construction defect litigation was impossible, it owed the general contractor a duty to defend the homeowner claim.

FACTUAL AND PROCEDURAL BACKGROUND

McMillin Homes Construction, Inc. acted as the developer and general contractor on the Auburn Lane housing community project in the city of Chula Vista.  It hired Martin Roofing Company, Inc. to "render a complete roofing job."  The subcontract required Martin to obtain general liability insurance naming McMillin as an additional insured.

---

[1]    After oral argument, the parties stipulated to a dismissal of this case.  We elected to proceed with the opinion given because the appeal was fully briefed and raised important issues.  (Cal. Rules of Court, rule 8.244(c)(2); *Greb v. Diamond Internat. Corp.* (2013) 56 Cal.4th 243, 247, fn. 3.)

2

National Fire and Marine Insurance Company issued a CGL policy to Martin. Effective from November 12, 2003 to November 12, 2004, the policy covered " 'property damage' " or " 'bodily injury' " caused by an " 'occurrence' " during the policy period. McMillin was covered as an additional insured under ISO endorsement form CG 20 09 03 97 (hereafter CG 20 09).[2] National Fire broadly agreed to cover property damage or bodily injury during the policy period arising out of Martin's ongoing operations at Auburn Lane, or out of McMillin's general supervision of those operations. Central to this appeal is the "care, custody or control exclusion" (hereafter CCC exclusion): National Fire excluded coverage for damage to property in McMillin's "care, custody, or control."[3]

In 2014, homeowners in seven projects developed and built by McMillin, including Auburn Lane, sued McMillin for construction defects. (*Gabriel Galvan*, *et al. v. McMillin Auburn Lane II*, *LLC*, *et al.* (Super. Ct. San Diego County, 2014, No. 37-2014-00007987-CU-CD-CTL) (*Galvan*).) The complaint alleged water intrusion and damage caused by roofing defects. Two homes that Martin worked on were at issue in *Galvan*.

---

[2]  The Insurance Services Office, or ISO, "is a nonprofit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." (*Montrose Chemical Corp. v. Admiral Ins. Co*. (1995) 10 Cal.4th 645, 671, fn. 13.)

[3]  Most other subcontractors added McMillin to their policies under CG 20 10 endorsements or their equivalents, which lack the CCC exclusion.

McMillin tendered its defense of the *Galvan* action to National Fire in June 2014, attaching a subcontract addendum for Martin's work; the additional insured endorsement; the *Galvan* complaint; a matrix of homes at issue in *Galvan*; and a matrix of insurance carriers McMillin believed owed a defense duty.  National Fire refused coverage, noting McMillin had not provided a copy of the McMillin-Martin subcontract.  McMillin submitted the subcontract and sought reconsideration.  National Fire again denied owing McMillin a duty to defend.

McMillin sued National Fire in 2016 for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.  With respect to each cause of action, the operative Third Amended Complaint alleged that National Fire breached its duty to defend McMillin in *Galvan*.

The parties agreed to bifurcate proceedings.  (Code Civ. Proc., § 598.)  Phase one was a bench trial on the papers to decide whether National Fire owed McMillin a duty to defend under the additional insured endorsement.  Jointly submitted exhibits included policy documents, the subcontract, *Galvan* pleadings, and communications between McMillin and National Fire regarding coverage.  National Fire also submitted deposition excerpts and discovery responses, but the court sustained McMillin's objections to these

on relevancy grounds because they were not known to National Fire when any defense duty was triggered.[4]

The parties offered competing interpretations of the CCC exclusion. Citing *Davis*, *supra*, 79 Cal.App.3d 863, McMillin argued it applied only where control over the damaged property was complete or exclusive. Disagreeing, National Fire noted those words were missing from the text of the exclusion. It also claimed a separate endorsement (CG 21 39 10 93 (hereafter CG 21 39)) intended to " 'close the loop' " by eliminating *indirect* indemnity coverage to McMillin for construction defect litigation pursuant to the subcontract.

The court entered judgment in favor of National Fire. It acknowledged decisions broadly construing the duty to defend for general contractors covered as additional insureds. (*Pulte Home Corp. v. American Safety Indemnity Co.* (2017) 14 Cal.App.5th 1086 (*Pulte*); *McMillin Management Services*, *L.P. v. Financial Pacific Ins. Co.* (2017) 17 Cal.App.5th 187 (*McMillin*).) But those cases did not involve the CG 20 09 endorsement with its CCC exclusion. As the first to construe that exclusion *in the GC 20 09 form*, the court declined to require *exclusive* or *complete* control.

The court stated the GC 20 09 endorsement was "specifically drafted to avoid affording insurance to a general contractor in a construction defect setting where the

_____

4    National Fire argues the court erred in sustaining McMillin's evidentiary objections. Because it did not file a cross-appeal or show that review of the issue is necessary to determine whether any error prejudiced McMillin, we decline to review this issue and ignore these documents. (Code Civ. Proc., § 906; *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9.)

[named] insured is a subcontractor." At the time National Fire refused to defend McMillin, two things were clear: McMillin was the general contractor, and the *Galvan* plaintiffs sued for construction defects in their homes. The court reasoned that these facts triggered the CCC exclusion. Moreover, the court agreed with National Fire that the CG 21 39 endorsement to Martin's policy was designed to " 'close[] the loop' " and demonstrated its intent to deny construction defect coverage to McMillin via *indirect* means. As the court read the record, "McMillin did not carefully read the insurance-related papers it received from Martin" or "consider the combined impact" of the CG 20 09 and CG 21 39 endorsements. It believed McMillin had no reasonable expectation of coverage for construction defect litigation.

## DISCUSSION

McMillin appeals the judgment, arguing the court misconstrued the CCC exclusion and erroneously relied on an unrelated GC 21 39 endorsement to find no defense duty. We agree and conclude National Fire owed McMillin a duty to defend.

1.    *Legal principles*

       a.       *The duty to defend*

Broader than the duty to indemnify, a liability insurer's duty to defend is assessed at the very outset of a case. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287 (*Hartford*); *Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1350 (*Pardee*).) "An insurer owes a broad duty to defend against claims that create a potential for indemnity under the insurance policy"; it must defend even where the evidence suggests but does not conclusively show the loss is not

6

covered. (*Hartford*, at p. 287.) Moreover, "the duty to defend is a continuing one, arising upon tender and lasting until the underlying litigation is resolved, or until the insurer has established there is no potential for coverage." (*Pardee*, at p. 1350.)

To evaluate whether an insurer owes a duty to defend, we start by comparing the allegations of the complaint to the terms of the policy. (*Hartford*, *supra*, 59 Cal.4th at p. 287.) Extrinsic facts may give rise to a duty to defend where they reveal the possibility of coverage. (*Ibid.*; *Pardee*, *supra*, 77 Cal.App.4th at p. 1350.) Doubt as to whether an insurer owes a duty to defend is resolved in the insured's favor. (*Hartford*, at p. 287.)

Although broad, the duty to defend is not limitless and is measured by the nature and kinds of risks covered by the policy. (*Hartford*, *supra*, 59 Cal.4th at p. 288.) "In an action seeking declaratory relief concerning a duty to defend, 'the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.' " (*Ibid.*) In a mixed action where only certain claims are potentially covered, the insurer has a duty to defend those potentially covered claims. (*Ibid.*) An insurer has no obligation to defend " 'if the third-party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage*.' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300 (*Montrose*).)

b.      *Rules governing insurance policy interpretation*

The "interpretation of an insurance policy is a question of law." (*Waller v. Truck Ins. Exchange*, *Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) Insurance policies are contracts,

7

and the ordinary rules of contract interpretation apply.  (*Maryland Cas. Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 28 (*Maryland*).)  The same rules of interpretation apply to endorsements, which are part of the insurance contract.  (*Id.* at p. 29.)

The mutual intent of the parties at contract formation governs.  (*Hartford*, *supra*, 59 Cal.4th at p. 288; Civ. Code, § 1636.)  We try to ascertain this intent from the policy provisions alone.  (*Maryland*, *supra*, 65 Cal.App.4th at p. 28.)  Words in a policy are construed in their ordinary and popular sense, unless the parties intended a technical sense or special meaning.  (*Hartford*, at p. 288; Civ. Code, § 1644.)  We also consider policy language in context to discern its intended function.  (*Hartford*, at p. 288; *Pulte*, *supra*, 14 Cal.App.5th at p. 1105.)

Although we will not strain to create an ambiguity, a provision is ambiguous when it is capable of two or more reasonable constructions.  (*Waller*, *supra*, 11 Cal.4th at pp. 18−19; *Pardee*, *supra*, 77 Cal.App.4th at p. 1352.)  Where ambiguity exists, we interpret the provision in the sense the insurer would believe the *insured* understood it at the time of contract formation.  (*Pardee*, at p. 1352; *Maryland*, *supra*, 65 Cal.App.4th at p. 29.)  This rule protects the objectively reasonable expectations of the insured, not the subjective beliefs of the insurer.  (*Maryland*, at p. 29.)  If that does not resolve the ambiguity, we will resolve it against the insurer, who created the uncertain language. (*Ibid.*; *Pardee*, at p. 1352.)

2.      *The parties' contentions*

National Fire's additional insured endorsement provides coverage to McMillin as an "additional insured" on the Martin policy "with respect to liability arising out of

> "A. [Martin's] ongoing operations performed for [McMillin] at [Auburn Lane], [and]
>
> "B. Acts or omissions of [McMillin] in connection with [its] general supervision of such operations."

Two recent decisions from this court broadly construe a general contractor-additional insured's right to a defense under the "ongoing operations" coverage provision. (*Pulte*, *supra*, 14 Cal.App.5th at p. 1113 [although property damage became evident after the work was completed, it could have occurred within the policy periods while subcontractor's operations were ongoing]; *McMillin*, *supra*, 17 Cal.App.5th at pp. 204−205 [rejecting insurer's claim that liability could not "arise out of" subcontractor's "ongoing operations" until after homeowners closed escrow, at which point subcontractors had completed their work].) Although the endorsement here, like the one in *McMillin*, excluded damages occurring after operations were completed, damage could begin during a subcontractor's ongoing operations in the policy period, triggering a duty to defend. (*McMillin*, at pp. 204−205.)

National Fire does not dispute that the additional insured endorsement covers McMillin for liability arising out of Martin's ongoing operations at Auburn Lane or out of McMillin's supervision of those operations during the policy period. Martin's policy was in effect from November 12, 2003 to November 12, 2004. It signed a roofing subcontract with McMillin in July 2003 and signed contract addendums in July 2004 and September 2004. One home included in the *Galvan* action was completed on November 29, 2004; the other was completed on March 15, 2005. The homeowners in *Galvan* alleged water intrusion due to defects in the roofing systems. Property damage could have occurred

9

while the subcontractor's operations were ongoing in the policy period.  Under *Pulte* and *McMillin*, the duty to defend was triggered based on the coverage provision.  National Fire does not suggest otherwise.

Instead, National Fire argues the *CCC exclusion* in the additional insured endorsement fundamentally distinguishes this case from *Pulte* and *McMillin*, which relied on CG 20 10 forms without that exclusion.  The additional insured endorsement applicable to McMillin does not cover:

> " 'Property damage'  to [¶] . . . [¶] Property in the care, custody, or
> control of the additional insured(s) or over which the additional
> insured(s) are for any purpose exercising physical control."

This exclusion, National Fire contends, "precluded a duty on the part of National Fire to defend McMillin as an additional insured in the *Galvan* action."  It argues that because McMillin was the general contractor on the project, any damage alleged in *Galvan* while the homes were being built would have been to property in McMillin's care, custody, or control.  Our question on appeal is whether the CCC exclusion, narrowly construed, is reasonably interpreted to *foreclose* coverage to a general contractor for construction defect liability.  As we explain, we believe it is not.

The arguments on appeal mirror those raised before the trial court.  McMillin argues that to read the insurance contract in the manner National Fire suggests would effectively nullify coverage for an additional insured general contractor, which is clearly not consistent with the reasonable expectations of either the named insured (Martin) or the additional insured (McMillin).  Relying on *Davis*, *supra*, 79 Cal.App.3d 863,

10

McMillin contends the CCC exception applies only where the insured has *exclusive* or *complete* control over the damaged property.

National Fire responds that coverage under the additional insured endorsement is not illusory in that there are *some* (albeit limited) situations in which a general contractor could be covered for property damage from a subcontractor's ongoing operations. Examples include property damage to a parked car or neighboring house caused by a Martin employee accidentally starting a fire or breaking a hydrant during its work. It claims the court, under the guise of interpretation, cannot insert words like " 'exclusive or complete' " that are not part of the policy language.

3.     *Having been judicially construed, the CCC exclusion is not ambiguous*

Where a policy term has been judicially construed, it is not ambiguous. (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 423 (*County of San Diego*).) "[T]he judicial construction of the term should be read into the policy unless the parties express a contrary intent." (*Bartlome v. State Farm* (1989) 208 Cal.App.3d 1235, 1239 (*Bartlome*), accord, *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1150; *Norris v. Pacific Indem. Co.* (1952) 39 Cal.2d 420, 424 (*Norris*) [provisions "should be given a meaning settled by judicial decision"].) This rule is applied " 'with caution, first determining whether the context in which the construed term is analogous . . . .' " (*Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London* (2008) 161 Cal.App.4th 184, 201.) As we explain, the CCC exclusion has been judicially construed in a sufficiently analogous context to require *exclusive* or *complete* control. (*Davis*, *supra*, 79 Cal.App.3d at p. 872.) The additional insured's mere status as

11

general contractor—with overall responsibility for and nominal control of the entire project—does not meet this standard.

a.      *The exclusion requires exclusive or complete control.*

*Davis* construed the CCC exclusion to apply only where the insured has exclusive or complete control—and not shared control—over the property that is damaged.  (*Davis*, *supra*, 79 Cal.App.3d at p. 872.)  Because the parties dispute the import of *Davis*, we explore the case and the authorities it relies on at length.

We begin with the California Supreme Court's decision in *Volf v. Ocean Acci. & Guarantee Corp.* (1958) 50 Cal.2d 373 (*Volf*), where a contractor was hired to apply a stucco exterior finish to a house.  Cracks in the stucco appeared during construction, before the homeowner took possession.  (*Id.* at p. 374.)  The contractor refinished the stucco at his expense; its insurer denied coverage; and the contractor sued.  (*Ibid.*)  On these facts, the insurer properly applied the exclusion for " 'injury to . . . property in the care, custody or control of the insured' " to defeat coverage.  (*Ibid.*)  The damage arose when the house exterior remained in the contractor's control.  (*Ibid.*)

In *Silva & Hill Constr. Co. v. Employers Mut. Liab. Ins. Co.* (1971) 19 Cal.App.3d 914 (*Silva*), the court also relied on the CCC exclusion to find no coverage on different facts.  The state contracted with an engineering firm to build a 10-mile stretch of highway.  (*Id.* at p. 928.)  The contract required the firm to secure CGL coverage, and an endorsement excluded coverage for injury to property "in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control."  (*Ibid.*)  After the highway was nearly built, the firm hired a subcontractor to

12

finish paving the two-foot shoulder.  The subcontractor broke the concrete edge along the full length of the 10-mile strip and over-sprayed an asphalt solution.  (*Ibid.*)  The firm made repairs at its expense, delaying the project and triggering liquidated damages.  (*Id.* at pp. 928−929.)  A payment dispute ensued between the engineering firm and the subcontractor, and the insurer denied coverage.

The court agreed that there was no coverage.  (*Silva*, *supra*, 19 Cal.App.3d at pp. 924–925.)  The engineering firm's argument that the road was not within its "care, custody or control" at the time of the accident was "clearly untenable" given the nature of its contract with the state.  (*Id.* at p. 924.)  "The state's contract expressly provided that plaintiff would at all times prior to completion of the project retain ultimate responsibility over the work of its subcontractors.  Indeed, it was this very requirement which caused the plaintiff to repair the road even though plaintiff's subcontractors had caused the damage."  (*Ibid.*)  In reaching this result, *Silva* suggested that there were limits to the exclusion.  Critically in discussing the *Volf* case, the *Silva* court remarked that if the stucco contractor had damaged the house's *structure* in removing the defective stucco, " '[t]he injury to the house would be covered, but the loss caused by having to remove the defective stucco would not be.' "  (*Id.* at p. 925.)

Seven years after *Silva, Davis* surveyed the landscape regarding the CCC exclusion.  From *Volf* and *Silva*, the *Davis* court concluded, "in the California cases that have applied the exclusion to defeat coverage, contractual responsibility for the entire operation rested with the insured."  (*Davis*, *supra*, 79 Cal.App.3d at p. 870.)  After examining a handful of out-of-state cases, *Davis* explained:

13

"Almost invariably where coverage is denied, physical control by the insured has been exclusive, even if such exclusivity was momentary, so long as the damage occurred in that moment. [Citation.] Our attention has been drawn to several cases in which the exclusion similarly defeated coverage despite the fact that the insured's control was not exclusive because he was receiving directions from another. [Citations.] Such cases are to be contrasted, however, with both the present case and with those denying effect to the exclusion and thus affirming coverage, where physical control was shared by another with the insured." (*Id.* at pp. 870−871.)

Noting that the care, custody, or control exclusion had been deemed both ambiguous and unambiguous, the *Davis* court believed "[t]he only consistency in these cases is the need for painstaking evaluation of the specific facts of each case, especially those that bear on the nature and extent of the insured's control." (*Davis*, *supra*, 79 Cal.App.3d at pp. 871−872.) It noted "the courts are not averse to holding [the exclusion] inapplicable where the control exercised by the insured—possessory or physical—is not exclusive and complete at the critical moment in question." (*Id.* at p. 872.)

With the rule settled, *Davis* turned to the facts before it. The insured, Davis, owned a 25-ton crane that was covered by a policy. Excluded from coverage was "property damage to . . . property in the care, custody or control of the insured as to which the insured is for any purpose exercising physical control." (*Davis*, *supra*, 79 Cal.App.3d at p. 867.) Two companies engaged in a road paving project rented the crane (with an operator) to dismantle and transport a concrete batch plant. (*Id.* at p. 866.) Davis's crane operator "was working completely blind" and relied on signals by the company employees. (*Id.* at p. 867.) As he lifted a pugmill, the crane cable split, causing the pugmill to fall and incur damage. (*Ibid.*) When the companies sued Davis, its insurer

14

denied coverage on the ground the pugmill was within Davis's care, custody or control at the time of the accident. (*Ibid.*) But on these facts, the court concluded there was coverage. (*Id.* at p. 872.) The most that could be said was that Davis *shared* control of the pugmill at the time of the accident with the companies that were guiding Davis's crane operator. (*Ibid.*) Accordingly, the exclusion did not apply to defeat coverage. (*Ibid.*)

We recognize that *Davis* differs in some respects—the crane company is akin to a *subcontractor* claiming it at most shared control with its general contractor. But the crucial point is that for purposes of interpreting the exclusion, *Davis* announced a general rule: the CCC exclusion is inapplicable where the facts at best suggest *shared* control. (*Davis*, *supra*, 79 Cal.App.3d at p. 872.)[5] Other courts have applied a similar standard. (See *Crane Service & Equipment Corp. v. United States Fidelity &Guaranty Co.* (1986) 22 Mass.App.Ct. 666 [496 N.E.2d 833, 835] [the degree of supervision—that typical of a general contractor over a subcontractor—was not enough to constitute custody or control]; *Eisenbarth v. Hartford Fire Ins. Co.* (Wyo. 1992) 840 P.2d 945, 950 ["total (not

---

[5] National Fire labels the *Davis* rule as dicta, arguing the crane operator had *no* control, not *shared* control. As we read it, *Davis* held that where an insured at best has shared control, the exclusion does not apply. Other courts applying California law also interpret *Davis* in this manner. (See *Legacy Partners*, *Inc. v. Clarendon American Ins. Co.* (S.D. Cal., Apr. 14, 2010, No. 08cv920 BTM (CAB)) 2010 U.S.Dist. Lexis 36966 at p. *22 ["where the 'care, custody or control' is not exclusive, this exclusion does not apply"]; *Nationwide Agribusiness Ins. v. George Perry & Sons*, *Inc.* (E.D.Cal. 2018) 338 F.Supp.3d 1063, 1076−1078 [fact issue precluded summary adjudication as to whether the property owner had "exclusive and complete" control of bee hives maintained by beekeepers].)

15

shared) care, custody or control is necessary for the exclusion to apply"]; *Hartford Cas. Co. v. Cruse* (5th Cir. 1991) 938 F.2d 601, 604 [exclusion is limited to property the insured " 'totally and physically manipulates' "].)[6]  The *Davis* rule is further consistent with insurance industry publications cited by McMillin.  (Internat. Risk Management Inst. Inc., Commercial Liability Insurance, CGH Damage to Property Exclusion <https://www.irmi.com/online/cli/ch005/1l05d000/bl05110-damage-to-property.aspx> [as of June 9, 2017] ["Property is not necessarily in the care, custody, or control of a general contractor just because it is in the care, custody, or control of a subcontractor."].)

Because the CCC exclusion has been judicially construed, it *is not ambiguous*. (*County of San Diego*, *supra*, 37 Cal.4th at p. 423.)  As the parties did not specifically express a contrary intent, the *Davis* construction should control the meaning of the

---

[6]     National Fire cites a pre-*Davis* out-of-state case, claiming it offers a better framework for interpreting the CCC exclusion.  (*Arrigo's Fleet Service*, *Inc. v. Aetna Life & Casualty Co.* (1974) 54 Mich.App. 482 [221 N.W.2d 206].)  Because the law interpreting the CCC exclusion was unsettled, the *Arrigo* court offered criteria to guide the trial court on remand.  (*Id.* at p. 493.)  As National Fire notes, the court suggested the CCC exclusion might defeat coverage where the damaged property was under the insured's "immediate supervision."  (*Ibid.*)  But *immediate* supervision (contrasted with general supervision) is not necessarily inconsistent with *Davis*'s requirement of complete or exclusive control.

16

exclusion. (*Bartlome*, *supra*, 208 Cal.App.3d at p. 1239; *Norris*, *supra*, 39 Cal.2d at p. 424.)[7]

The trial court believed that requiring exclusive or complete control would insert words into what it viewed as an unambiguous exclusion. Urging us to follow suit, National Fire cites cases that did not permit words to be inserted into unambiguous policy provisions. (*Rosen v. State Farm Gen. Ins. Co.* (2003) 30 Cal.4th 1070, 1075, 1080 [where policy covered physical loss due to collapse, defined as "actually fallen down or fallen into pieces," court could not construe it to cover homeowner's repair of decks that were in a state of *imminent* collapse]; *Cal. Cas. Ins. Co. v. Northland Ins. Co.* (1996) 48

---

[7] For the first time at oral argument, National Fire claimed the CCC exclusion was "very different" from the one in *Davis*, compelling a different interpretation. In *Davis*, the exclusion applied to damaged property in the insured's care, custody, or control *as to which* the insured exercises physical control. (*Davis*, *supra*, 79 Cal.App.3d at p. 867.) Here, the exclusion applies to damaged property in the additional insured's care, custody, or control *or* over which the additional insured exercises physical control. The difference lies in whether "physical control" is required for the exclusion to apply. In *Davis* it was, with physical control *modifying* the "care, custody, or control" language; here, it is not. In effect, National Fire claims that by mandating physical control, the *Davis* exclusion is narrower, resulting in broader coverage than envisioned here.

It is not generally appropriate to consider a new contention raised for the first time at oral argument. (*Palp*, *Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 291, fn. 2.) But even if we did, *Davis* did not turn on whether the crane operator exercised physical control—there was no dispute he did. The question instead was whether his potentially *shared* control during the crane's operation eliminated coverage for the damaged pugmill. That "physical control" modifies "care, custody, or control" in *Davis* is a distinction without a difference. *Davis* indeed relied on *Silva*, which involved an exclusion mirroring the one here, to articulate its rule. (*Davis*, *supra*, 79 Cal.App.3d at pp. 870−871; *Silva*, *supra*, 19 Cal..App.3d at p. 923.) As a factual matter, National Fire agrees McMillin exercised both physical control and general care, custody, and control over the jobsite. To the extent there is any meaningful difference between the exclusion in *Davis* and the one here, National Fire has not identified it in proceedings before the trial court or on appeal.

17

Cal.App.4th 1682, 1690−1692 [where policy excluded injury from a watercraft, court would not strain to imply additional requirements that the watercraft have a transmission, shaft, propeller, or rudder]; *21st Century Indemnity Co. v. Superior Court* (2015) 240 Cal.App.4th 322, 331 [where auto insurance policy excluded coverage for vehicles " 'available for regular use' " by a relative, court would not limit that term to vehicles *exclusively* so used].)  Simply put, we are not writing on a blank slate.  The cases cited by National Fire do not reference the same exclusion, risk, or subject matter, and for 40 years *Davis*'s construction of the CCC exclusion has required exclusive or complete control.[8]

        b.      *National Fire effectively concedes shared control*

*Davis* highlighted "the need for painstaking evaluation of the specific facts of each case, especially those that bear on the nature and extent of the insured's control."  (*Davis*, *supra*, 79 Cal.App.3d at pp. 871−872.)  National Fire's interpretation of the CCC exclusion does not rest on *facts*.  It instead rests on an assumption:  "it is common knowledge that a general contractor is ultimately and at all times responsible for all aspects of the construction of residential housing which includes their components."  National Fire does not seem to dispute there was shared control here between McMillin and Martin.  Indeed, this conclusion is inescapable from the record.

---

8    The trial court noted it was the first to construe the CCC exclusion in the CG 20 09 endorsement.  We see no reason to ignore *Davis* because the exclusion here appears in an endorsement rather than the basic policy.  "[E]ndorsements are part of the insurance contract" and are interpreted in the same manner as other parts of a policy.  (*Maryland*, *supra*, 65 Cal.App.4th at p. 29.)

18

Martin agreed to furnish all labor, materials, and equipment needed "to render a complete roofing job." It was "primarily and directly responsible for the activities and conduct of its employees, subcontractors, agents and suppliers." All materials, equipment, and tools remained Martin's property until they were integrated into the structure and approved by McMillin. It was Martin's job to coordinate with other subcontractors associated with its roofing work. Martin agreed to protect the building from any damage by its employees. To be sure, all work had to be performed to McMillin's "complete satisfaction." McMillin set schedules and could engage another subcontractor, after notice, if Martin failed to meet deadlines. But McMillin could *only* set schedules as needed to ensure "the proper and timely coordination and completion of the entire project."

In short, McMillin was responsible for the whole project and coordinating schedules to ensure the project finished on time. But Martin was responsible for controlling its jobsite and supervising the roofing work. Considering case-specific facts "that bear on the nature and extent of the insured's control" (*Davis*, *supra*, 79 Cal.App.3d at p. 872), Martin and McMillin shared control over Martin's roofing work. Accordingly, National Fire did not prove the CCC exclusion rendered coverage for the *Galvan* litigation an impossibility. (*Hartford*, *supra*, 59 Cal.4th at p. 288.)

4.      *Assuming ambiguity, National Fire still owed a duty to defend*

"A policy provision is ambiguous when it is susceptible to two or more reasonable constructions." (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 (*E.M.M.I.*).) If we set aside *Davis* and presume the CCC exclusion is ambiguous, only

19

McMillin's interpretation—that "control" requires something more than mere general contractor status—comports with the reasonable expectations of an insured. The CG 21 39 endorsement does not change this conclusion.

a. *The reasonable expectations of the insured*

A liability policy is presumed to include a defense duty unless it is excluded by clear and unambiguous language. (*Maryland*, *supra*, 65 Cal.App.4th at p. 30.) Any limitations on a promised duty to defend must accordingly be " ' "conspicuous, plain and clear." ' " (*Ibid.* [collecting cases].) This rule applies with particular force when the coverage provisions would lead an insured to reasonably expect coverage for the claim purportedly excluded. (*E.M.M.I.*, *supra*, 32 Cal.4th at p. 471.) While courts "generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822), exclusions are narrowly construed (*Waller*, *supra*, 11 Cal.4th at p. 16). Where a term is ambiguous, we look to the policy, the circumstances of the case, and common sense to infer the reasonable expectations of the insured. (*Maryland*, at p. 30.)

McMillin was the general contractor of the Auburn Lane housing project. Its subcontract required Martin to maintain CGL coverage with McMillin as an additional insured. Consistent with that obligation, Martin added McMillin to the policy in effect from November 2003 to November 2004. Since construction defect litigation "is typically complex and expensive, a key motivation in procuring an additional insured endorsement is to offset the cost of defending lawsuits where the general contractor's liability is claimed to be derivative." (*Maryland*, *supra*, 65 Cal.App.4th at p. 33.) The

20

CG 20 09 form included an express duty to defend as to Martin's "ongoing operations" for McMillin at Auburn Lane *and* McMillin's acts or omissions "in connection with [its] general supervision of such operations." This language unambiguously covers construction defect litigation pertaining to Martin's ongoing operations and McMillin's supervision of those operations during the policy period.

Reading the CCC exclusion in a manner that nullifies the broad coverage provision for a general contractor sued for construction defects is not consistent with an insured's objectively reasonable expectations. (*E.M.M.I.*, *supra*, 32 Cal.4th 465, 474 [insurer's expansive construction of an exclusion was inconsistent with the "broad coverage language"].) In construing policy language, we assess "the meaning a layperson would ordinarily attach to it." (*Waller*, *supra*, 11 Cal.4th at p. 18.) National Fire's construction bears little connection to the risk involved or the reason for a general contractor to seek coverage as an additional insured. Its stance might be "reasonable in the abstract," but it is inconsistent with the basic rule that limitations on a promised defense duty must be conspicuous, plain, and clear. (*Maryland*, *supra*, 65 Cal.App.4th at p. 30.) Moreover, to the extent ambiguity remains after we consider the provision in context, we construe it against the insurer. (*Pardee*, *supra*, 77 Cal.App.4th at p. 1352.)

All that was required to trigger a defense duty was the *potential* of coverage. (*Hartford*, *supra*, 59 Cal.4th at p. 288.) National Fire had to establish "*the absence of any such potential*." (*Ibid.*) It did not meet its burden to prove the CCC exclusion rendered coverage in the *Galvan* action an impossibility. Even if the provision is deemed ambiguous, construing it to operate as a blanket denial of coverage to any general

21

contractor-additional insured sued for construction defects does not meet the reasonable expectations of the insured.

*Blackhawk Corp. v. Gotham Ins. Co.* (1997) 54 Cal.App.4th 1090, cited by National Fire, is inapposite. It stands for the proposition that coverage is not illusory where there are potential risks a policy covers notwithstanding a broad exclusion. (*Id.* at p. 1097.) Not only is the exclusion here less explicit than the exclusion for subsidence damage in *Blackhawk*, the examples of coverage National Fire offers are more far-fetched. A general contractor would not reasonably believe its additional insured coverage extended only to property damage to a home or vehicle *outside* the scope of the project. And even if coverage would not be *illusory* in a theoretical sense, we must assess whether it meets the *reasonable expectation* of the insured.[9]

An insurer need not defend if a third-party complaint cannot raise a single issue that would bring it within the policy coverage under any conceivable theory. (*Montrose*, *supra*, 6 Cal.4th at p. 300.) Although an insured only needs to show that an underlying claim *might* be covered, the insurer must prove it *cannot be*. (*Ibid.*; *Hartford*, *supra*, 59 Cal.4th at p. 288.) Based on the foregoing, National Fire did not meet its burden and therefore owed McMillin a duty to defend in the *Galvan* action.

---

[9] "An agreement is illusory and there is no valid contract when one of the parties assumes no obligation." (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 95.)

b. *The CG 21 39 endorsement*

Finally, we turn to National Fire's argument that limits to the *named insured*'s coverage " 'closed the loop' " on McMillin's coverage for construction defect litigation. The somewhat convoluted argument goes as follows:

1.  A general contractor has two ways of getting an insurer to cover its defense fees in a construction defect lawsuit vis-à-vis its subcontractor.  The first is by being named as an additional insured on its subcontractor's policy.  This does not provide coverage here because of the CCC exclusion.

2.  Alternatively, the subcontractor's insurer could be responsible for defense costs based on an indemnity provision in the subcontract agreement.  Martin's policy excludes coverage for property damage Martin is contractually obliged to pay.  Although an exception allows coverage for liability assumed in an "insured contract," CG 21 39 defines "insured contract" narrowly to *exclude* indemnification agreements like the one in the McMillin-Martin subcontract.

The latter argument turns on the CG 21 39 endorsement.  Martin's policy broadly excluded coverage for " 'property damage' for which [Martin] is obligated to pay by reason of the assumption of liability in a contract."  An exception *reinstates* coverage for liability Martin assumes in an "insured contract."  "Insured contract" is elsewhere defined to include:

> "That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization."

If the policy were to stop there, it would *cover* tort liabilities Martin assumed in its indemnity agreement with McMillin.  However, Martin's contract also contains a CG 21 39 endorsement.  That endorsement replaces the definition of "insured contract" in the

23

policy with one that *omits* the paragraph quoted above. The net effect, National Fire contends, is to eliminate coverage for obligations assumed in an indemnity agreement between McMillin and Martin.

In a nutshell, National Fire argues that by broadening the scope of an exclusion as to *Martin*, it closed the loop on its duty to cover *McMillin* for construction defect litigation. Construing the policy as a whole, National Fire believes the combined effect of these two exclusions showed *its* intent to eliminate its duty to pay for McMillin's defense in *Galvan* "whether to McMillin directly as an additional insured or to McMillin indirectly as an indemnitee of Martin Roofing." Accepting this theory, the trial court concluded "National Fire did not intend for this endorsement to reach construction defect litigation."

The argument is unpersuasive for a simple reason. In resolving an ambiguity, we interpret provisions in the sense an *insured* reasonably understood them at the time of contract formation. (*Maryland*, *supra*, 65 Cal.App.4th at p. 29.) This rule does not protect the subjective beliefs of the *insurer*, but rather the objectively reasonable expectations of the insured. (*Ibid.*) Even if we accept the premise of National Fire's argument, its intent as to coverage does not resolve which of two purportedly reasonable constructions of the CCC exclusion comports with the *insured*'s objectively reasonable expectations.

24

DISPOSITION

The judgment is reversed, with directions to enter a new judgment in McMillin's favor as to National Fire's duty to defend.  McMillin is entitled to recover its costs on appeal.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.