Filed 6/28/24  Sorroza v. Express Services CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LUIS IGNACIO SORROZA, | |
| Plaintiff and Respondent, | G062052 |
| v. | (Super. Ct. No. 30-2021-01237742) |
| EXPRESS SERVICES, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Peter J. Wilson, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, Morgan P. Forsey, Tyler J. Johnson and Emily A. Papania; ArentFox Schiff, Morgan P. Forsey and Brett D. Young for Defendant and Appellant.

Jackson, Armond M. Jackson, Andrea M. Fernandez-Jackson and Anthony S. Filer for Plaintiff and Respondent.

Defendant Express Services, Inc. (Express) appeals from an order: (1) overruling some of its hearsay objections to plaintiff Luis Ignacio Sorroza's supplemental declaration; and (2) denying a motion to compel arbitration of Sorroza's claims under Labor Code Private Attorneys General Act of 2004 (PAGA; Lab. Code, § 2698 et seq.). Express argues the trial court erred by allowing Sorroza to file a supplemental declaration because the trial court was required to follow its initial finding in its tentative ruling. It next challenges the trial court's order overruling some of its hearsay objections. Lastly, Express contends the trial court erred by finding Sorroza was a transportation worker engaged in interstate commerce and was therefore exempt from the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.; all undesignated statutory references are to this code).

We affirm. We hold the trial court properly allowed Sorroza to file a supplemental declaration because it was not bound to its tentative ruling. We find the trial court did not abuse its discretion by overruling certain hearsay objections. We also conclude Sorroza was a transportation worker within the ambit of section 1's exemption following *Southwest Airlines Co. v. Saxon* (2022) 596 U.S. 450 (*Saxon*).

FACTS

In November 2019, Sorroza began working for Express, a franchisor of full-service staffing firms, and signed a mutual arbitration agreement (Agreement). The Agreement provided "all legal disputes and claims between [the parties] shall be determined exclusively by final and binding arbitration . . . ." "[C]laims" included "all claims pertaining to Individual's employment or other relationship with [Express] (including application for or termination of employment or other relationship) and all claims for . . . wages, overtime, benefits, or other compensation . . . ." Actions to compel arbitration were "governed by Section 2 of the [FAA], 9 U.S.C. § 2, and not any state law."

After Sorroza signed the Agreement, Express placed Sorroza to work at Jellco Container, Inc. (Jellco), a manufacturer of corrugated boxes. Sorroza's duties

2

included operating a forklift in Jellco's shipping and receiving department and the loading and unloading of trucks that transported goods across state lines to and from Arizona.

PROCEDURAL HISTORY

In December 2021, Sorroza filed a putative class action against Express and Jellco, alleging 10 causes of action for violating various sections of the Labor Code, Industrial Welfare Commission wage orders, and the Business and Professions Code section 17200 et seq. In March 2022, Sorroza amended his complaint to add a PAGA cause of action.

In May 2022, the parties filed a stipulation and proposed order with the trial court to dismiss the class claims, allow Sorroza to file a second amended complaint, and stay the action pending the decision in *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639 (*Viking River*). The next day, the trial court entered the order.

In August 2022, Express moved to compel arbitration of Sorroza's individual PAGA claim and to dismiss Sorroza's representative PAGA claims under *Viking River*. Jellco joined the motion.

In September 2022, Sorroza filed his second amended complaint, alleging only a single cause of action for violating PAGA. He alleged Express and Jellco were joint employers. He alleged Express and Jellco failed to: (1) pay minimum wages; (2) pay overtime wages; (3) provide meal breaks; (4) provide rest periods; (5) maintain records and provide accurate itemized wage statements; (6) pay all wages following the termination, resignation, or end of employment; and (7) pay for unreimbursed business expenses.

Later in September 2022, Sorroza opposed the motion to compel arbitration of the individual PAGA claim and to dismiss the representative PAGA claims. Of relevance here, Sorroza argued he belonged to a "'class of workers engaged in foreign or interstate commerce'" under section 1, citing *Saxon*, *supra*, 596 U.S. at page 455, and

3

thus he was exempt from the FAA's coverage. In support of his opposition, he supplied a declaration.

In reply to the opposition, Express argued Sorroza relied on inadmissible evidence to support his section 1 exemption argument and Sorroza was not a transportation worker exempt from the FAA's coverage. Express filed evidentiary objections to Sorroza's declaration.

In a tentative ruling, the trial court granted the motion to compel arbitration of Sorroza's individual PAGA claim and stayed the representative PAGA claims pending the completion of the arbitration. It found Sorroza did not present "admissible evidence that the class of workers of which he is a part was engaged in interstate commerce."

But Sorroza contested the tentative ruling. In October 2022, the trial court allowed Sorroza to file a supplemental declaration and continued the hearing on the motion to compel arbitration.

Sorroza filed a supplemental declaration in support of his opposition to the motion to compel arbitration. In his supplemental declaration, Sorroza stated in pertinent part:

"4. I was assigned by [Express] to work inside of [Jellco's] warehouse located in Anaheim, California. From my training I learned that Jellco manufactured corrugated products or '[p]ackaging' for other manufacturers and distributors. My job duties were to operate a forklift in Jellco's shipping and receiving department.

"5. During my shifts, I was tasked with operating the forklift to offload material from logistic trucks. That material was used to manufacture Jellco's product. I was also tasked with transferring product from the manufacturing line to the shipping department, and I would either 'stage' the product at the dock to be loaded onto a logistics truck or I would load the logistic truck myself.

"6. My [s]hipping supervisor was named 'Paul' and my lead was named 'Miguel.' Both of these employees were employed at Jellco during my tenure and should have knowledge of the assigned tasks given to me day to day.

"7. The main product that I recall[] offloading from logistic trucks was corrugated fiberboard sheets and starch (used to make glue). . . . I have knowledge of this because I specifically saw logistic trucks with Arizona business labels affixed to the side of the truck and an Arizona license plate. . . . At times I was given the shipping receipt by the driver of that truck, that needed to be signed by an authorized receiver, so I would take it and hand it to personnel in the office. I would see that the slip would inform that the load came from Phoenix, Arizona. Moreover, when a truck would arrive, I would be summoned on the radio from my supervisor with a statement 'Phoenix is here' or 'Arizona is here.' Meaning I needed to stop what I was doing and report to the dock because the logistic truck from Arizona arrived at the dock.

"8. When I 'staged' or loaded product onto logistic trucks I was often told where the product was traveling to, because that is how we knew to complete and prioritized our tasks. Some logistic trucks that I loaded were traveling locally to Los Angeles and Orange County, and some trucks were traveling to customers in other states. I specifically recall that some of the manufacture product I had personally loaded onto logistic trucks were in route to customers located in Arizona."

Express objected to various statements in Sorroza's supplemental declaration on several grounds, including hearsay. In response to Sorroza's supplemental declaration, Express filed a declaration of Ralph Ramirez. Ramirez stated he was a "Corrugated Manager of Jellco," and oversaw corrugated operations and shipping. Ramirez explained in pertinent part:

"4. Jellco does not own or operate any flatbed trucks, logistics trucks, or trucks that ship products, in or outside of California. Jellco does not own or operate any

vehicles that transport any of the products Jellco manufactures to any destinations – either within or outside of California.

"5.  I was one of the individuals who oversaw the work of forklift drivers, including . . . Sorroza.  While Mr. Sorroza did perform forklift duties, his duties were not limited to that.  Rather, Mr. Sorroza also performed other duties around the warehouse, including shrink wrapping pallets of product, cleaning, and other non-forklift duties.  In addition, in connection with his forklift duties, Mr. Sorroza was not limited to loading and unloading product from trucks.  Mr. Sorroza would have also moved product from manufacturing machines to other locations within the warehouse, as needed."

In a November 2022 minute order, the trial court denied the motion to compel arbitration.  It found, because Sorroza was "a person doing the work of loading or unloading cargo onto or from 'a vehicle carrying goods in interstate transit,'" he was exempt from the FAA's coverage.  It also overruled certain hearsay objections to Sorroza's declaration.  Express timely appealed the order denying the motion to compel arbitration and overruling those hearsay objections.

DISCUSSION

I.

THE TRIAL COURT WAS NOT BOUND TO ITS TENTATIVE RULING

Express first argues the trial court erred by permitting Sorroza to file a supplemental declaration because, in its tentative ruling, the trial court found Sorroza presented no admissible evidence demonstrating he belonged to a class of workers engaged in interstate commerce.  Express asserts, because of this initial finding, the trial court was required to grant Express's motion to compel arbitration.  In other words, Express contends the trial court was required to adhere to its tentative ruling.  We disagree.

"Tentative rulings 'indicate the way the judge is prepared to decide the matter based on the information before him or her when the ruling was prepared.'"

6

(*Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1245.) "[A] trial court's tentative ruling is not binding on the court; the court's final order supersedes the tentative ruling. [Citations.] A trial court's final order on a motion is 'made a matter of record in order to avoid any uncertainty as to what its action has been. [Citation.] The record may be made by a written order signed by the judge and filed with the court [citation] or it may be set forth in detail in the court's minutes [citations].'" (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300.)

Here, the trial court issued a tentative ruling in October 2022. After Sorroza contested the tentative ruling and the trial court held a hearing, the trial court continued the hearing on the motion to compel arbitration and permitted Sorroza to file a supplemental declaration.[1] Thus, this tentative ruling did not become the trial court's final order. The final order was entered in November 2022 following the continued hearing. As the trial court was under no obligation to abide by its October 2022 tentative ruling, it did not err by allowing Sorroza to file a supplemental declaration.

II.

THE TRIAL COURT PROPERLY OVERRULED EXPRESS'S EVIDENTIARY OBJECTIONS

Express next argues the trial court erred by overruling Express's hearsay objections to certain statements in Sorroza's supplemental declaration. Specifically, Express challenges the following statements on appeal: "[7.] I would see that the slip would inform that the load came from Phoenix, Arizona. Moreover, when a truck would

---

[1] According to the register of actions, the trial court issued a minute order after the October 2022 hearing. That order is not in the record; the notice of ruling is. The "notice of ruling is not an order." (*Shpiller v. Harry C's Redlands* (1993) 13 Cal.App.4th 1177, 1179.) "In event of any discrepancy between the two, the order is the governing document." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2023) ¶ 9:320.4a, p. 9(I)-152.) Because Express does not argue the notice of ruling is distinguishable from the October 2022 minute order, we infer the notice of ruling reflects the trial court's October 2022 minute order.

arrive, I would be summoned on the radio from my supervisor with a statement 'Phoenix is here' or 'Arizona is here.' Meaning I needed to stop what I was doing and report to the dock because the logistic truck from Arizona arrived at the dock. [¶] 8. When I 'staged' or loaded product onto logistic trucks I was often told where the product was traveling to, because that is how we knew to complete and prioritized our tasks. Some logistic trucks that I loaded were traveling locally to Los Angeles and Orange County, and some trucks were traveling to customers in other states."

Hearsay is "an out-of-court statement offered to prove the truth of the matter" asserted. (*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 749, citing Evid. Code, § 1200, subd. (a).) "Hearsay is inadmissible, unless it comes under a statutory exception. (E.g., Evid. Code, §§ 1220–1390.)" (*Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 610 (*Bowser*).)

The applicable exception to the hearsay rule here is found in Evidence Code section 1222, subdivision (a). It provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement . . . ." (Evid. Code, § 1222, subd. (a).) "'The rule is that ""whatever is said by an agent, either in the making of a contract for his principal, or at the time, and accompanying *the performance of any act, within the scope of his authority*, . . . of the particular contract or transaction in which he is then engaged, is, in legal effect, said by his principal, and admissible as evidence . . . . But declarations or admissions by an agent, of his own authority, and not accompanying the making of a contract, or the doing of an act, in behalf of his principal, . . . are not binding upon his principal . . . and are not admissible . . ."' [Citation.]" [Citation.]'" (*Bowser*, *supra*, 78 Cal.App.5th at p. 612.)

The authorized admission rule "can apply to lower-ranking agents. (E.g., *Consolidated Management Group, LLC v. Department of Corporations* (2008) 162

8

Cal.App.4th 598, 604, 614 [salesman was authorized to send out promotional materials]; *W. T. Grant Co. v. Superior Court* (1972) 23 Cal.App.3d 284, 286–287 [manager of one store in multistore chain was authorized to make statement to subordinate about company policy]; see also *Crawford v. County of Sacramento* (1966) 239 Cal.App.2d 791, 799–801 [declarant 'was *neither* high in the hospital's hierarchy and therefore its spokesman to make admissions, *nor* did the alleged admission concern a matter within the scope of his agency' (italics added & omitted)].)" (*Bowser*, *supra*, 78 Cal.App.5th at p. 613.)

Generally, "'the determination requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement.' [Citation.] [¶] A statement is 'admissible as an authorized admission . . . only . . . where a proper foundation has been laid as to the declarant's authorization to speak on behalf of the party against whom the statement is offered. [Citations.]' [Citations.] The proponent of the evidence must introduce 'evidence sufficient to sustain a finding of such authority . . . .' (Evid. Code, § 1222, subd. (b).)" (*Bowser*, *supra*, 78 Cal.App.5th at p. 613.)

"'We review the trial court's determination as to the admissibility of evidence, including the application of exceptions to the hearsay rule, for an abuse of discretion. [Citations.] Under this standard, the trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Bowser*, *supra*, 78 Cal.App.5th at p. 610.)

In his supplemental declaration, Sorroza stated his shipping supervisor Paul and his lead Miguel "should have knowledge of the assigned tasks given to [him] day to day."[2] Under this highly deferential standard of review, that statement—when combined with Sorroza's declarations that he was "summoned" by his supervisor to the dock with

---

[2] Paul and Miguel's last names are not in the record. No disrespect is intended by using their first names.

9

the announcement, "'Arizona is here,'" and that Sorrozo was informed of the geographical destinations of the trucks he was loading—was sufficient to show Sorroza's supervisor had the customary authority to speak on behalf of Jellco. Together, these statements also showed the supervisor made the announcement within the scope of the supervisor's employment.

Therefore, we conclude the trial court did not abuse its discretion by admitting the statements under the party opponent exception (specifically, the authorized admission exception). We need not consider Express's other hearsay arguments, particularly pertaining to *Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, because an appellate court "'will affirm the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those expressly stated by the trial court.'" (*People v. Mani* (2022) 74 Cal.App.5th 343, 369, fn. 9.)

III.

SORROZA WAS EXEMPT FROM THE FEDERAL ARBITRATION ACT'S COVERAGE

We now consider the pivotal question on appeal: whether Sorroza was a transportation worker engaged in interstate commerce and falls within section 1's exemption from the FAA's coverage. Express argues Sorroza does not. It argues Sorroza was not a transportation worker because he does not work for a transportation company. Sorroza contends he was a transportation worker within the ambit of section 1's exemption. We agree with Sorroza.

A. *Standard of Review*

Express argues we should employ the de novo standard of review when considering a trial court's order denying a petition to compel arbitration. But "'"[t]here is no uniform standard of review for evaluating an order denying a motion to compel arbitration."'" (*Franco v. Greystone Ridge Condominium* (2019) 39 Cal.App.5th 221, 227.) If the order rests solely on a decision of law, the de novo standard of review applies. (*Ibid.*; *Muller v. Roy Miller Freight Lines, LLC* (2019) 34 Cal.App.5th 1056,

10

1061 (*Muller*).) "'Decisions on issues of fact are reviewed for substantial evidence.'" (*Muller*, at p. 1061.)

### B. The FAA and Section 1's Exemption for Transportation Workers

The FAA was enacted in 1925 in "response to hostility of American courts to the enforcement of arbitration agreements . . . ." (*Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 111 (*Circuit City*).) To effectuate this purpose, the FAA requires judicial enforcement of arbitration agreements. (*Ibid.*) Section 2, its coverage provision, applies the FAA to contracts "evidencing a transaction involving commerce . . . ." (9 U.S.C. § 2.)

Section 1 exempts from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (§ 1.) The exemption applies to "only contracts of employment of transportation workers." (*Circuit City*, *supra*, 532 U.S. at p. 119.) It covers not only contracts between employers and employees, but also contracts with independent contractors. (*New Prime Inc. v. Oliveira* (2019) 586 U.S. 105, 108, 121.)

In determining whether a worker falls within the catchall category of section 1's exemption—"any other class of workers engaged in foreign or interstate commerce"—we use a two-step analysis. First, we define "the relevant 'class of workers' to which" the worker belongs. (*Saxon*, *supra*, 596 U.S. at p. 455.) Second, we consider whether the class of workers is "actively 'engaged in transportation' of . . . goods across borders via the channels of foreign or interstate commerce." (*Id.* at p. 458.)

### C. Saxon

In *Saxon*, a ramp supervisor worked for Southwest Airlines. (*Saxon*, *supra*, 596 U.S. at p. 453.) Her work often required loading and unloading "baggage, airmail, and commercial cargo on and off airplanes that travel across the country." (*Ibid.*) The ramp supervisor brought a putative class action against Southwest for failure to pay overtime wages, despite having agreed to arbitrate wage disputes individually in her

11

employment contract. (*Id.* at p. 454.) Southwest sought to enforce the arbitration agreement and, in response, the ramp supervisor argued section 1 exempted her from the FAA's coverage. (*Ibid.*)

The United States Supreme Court held the ramp supervisor belonged "to a 'class of workers engaged in foreign or interstate commerce' that is exempted [under section 1] from the [FAA's] coverage." (*Saxon*, *supra*, 596 U.S. at p. 453.) The court first defined "the relevant 'class of workers' to which" the ramp supervisor belonged. (*Id.* at p. 455.) Citing dictionaries contemporary with the FAA, the court explained the focus of this inquiry is on the actual work performed by the class of workers: "[T]he FAA speaks of '"workers,"' not '"employees" or "servants."' [Citation.] The word 'workers' directs the interpreter's attention to 'the *performance* of work.' [Citations].] Further, the word 'engaged'—meaning '[o]ccupied,' 'employed,' or '[i]nvolved,' [citations]—similarly emphasizes the actual work that the members of the class, as a whole, typically carry out. [The ramp supervisor] is therefore a member of a 'class of workers' based on what she does at Southwest, not what Southwest does generally." (*Id.* at p. 456.) The court found the ramp supervisor belonged "to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis." (*Ibid.*, fn. omitted.)

*Saxon* next examined whether the "class of airplane cargo loaders is 'engaged in foreign or interstate commerce'" pursuant to section 1. (*Saxon*, *supra*, 596 U.S. at p. 456.) The court, drawing again on dictionaries contemporary with the FAA, interpreted section 1's text: "to be 'engaged' in something means to be 'occupied,' 'employed,' or 'involved' in it. 'Commerce,' meanwhile, includes, among other things, 'the transportation of . . . goods, both by land and by sea.' [Citations.] Thus, any class of workers directly involved in transporting goods across state or international borders falls within [section] 1's exemption." (*Saxon*, at p. 457.)

12

The court found airplane cargo loaders formed "'a class of workers engaged in foreign or interstate commerce.'" (*Saxon*, *supra*, 596 U.S. at p. 457, fn. omitted.) It explained: "We have said that it is 'too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it.' [Citation.] We think it equally plain that airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods." (*Ibid.*)

*Saxon* acknowledged that the *Circuit City* court held section 1 "exempted only contracts with transportation workers, rather than all employees, from the FAA," without providing "a complete definition of 'transportation worker.'" (*Saxon*, *supra*, 596 U.S. at p. 458, citing *Circuit City*, *supra*, 532 U.S. at p. 119.) Nonetheless, *Circuit City* "indicated that any such worker must at least play a direct and 'necessary role in the free flow of goods' across borders. [(*Circuit City*, *supra*, 532 U.S. at p. 121.)] Put another way, transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." (*Saxon*, *supra*, 596 U.S. at p. 458.) The Supreme Court concluded: "Cargo loaders exhibit this central feature of a transportation worker. . . . [O]ne who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.,* transportation) of that cargo. '[T]here could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit." (*Id.* at pp. 458–459.)

*D. Sorroza Falls Within Section 1's Exemption for Transportation Workers*

        1.  Sorroza Belonged to a Class of Workers Who Load and Unload Goods On and Off Trucks

We apply *Saxon* to the present case. "We begin by defining the relevant 'class of workers' to which [Sorroza] belongs." (*Saxon*, *supra*, 596 U.S. at p. 455.) Our focus is on "'the *performance* of work'" and "the actual work that the members of the class, as a whole, typically carry out." (*Id.* at p. 456.) Sorroza operated a "forklift to offload material from logistic trucks." He also staged Jellco's products at the dock to be loaded onto logistic trucks or loaded the products himself.

At oral argument, Express contended for the first time Sorroza did not *frequently* load and unload goods on and off trucks crossing state lines. Before the trial court, Express presented arguments regarding only the scope of Sorroza's duties (i.e., whether Sorroza was employed to load and unload shipments) rather than the frequency of certain duties. We generally do not "consider a new contention raised for the first time at oral argument." (*McMillin Homes Construction, Inc. v. National Fire & Marine Ins. Co.* (2019) 35 Cal.App.5th 1042, 1056, fn. 7.) Even if we were to consider these arguments, we would find Express "has not meaningfully contested" forklift drivers like Sorroza frequently load and unload goods. (*Saxon*, *supra*, 596 U.S. at p. 456.) In his declaration, Ramirez, a manager at Jellco, did not challenge Sorroza's duties included loading and unloading materials. Instead, as the trial court properly found, Ramirez confirmed Sorroza "did perform forklift duties" and his duties were "not limited to loading and unloading product from trucks."

Under the substantial evidence standard of review, "'[i]f the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence.'" (*Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1512.) While the trial court did not expressly find Sorroza *frequently* loaded and unloaded goods on and off trucks,

substantial evidence supports Sorroza did. Therefore, Sorroza belonged to a class of workers who load and unload goods on and off trucks "on a frequent basis." (*Saxon*, *supra*, 596 U.S. at p. 456.)

2. Sorroza Belonged to a Class of Workers Engaged in Interstate Commerce

Next, we consider whether that class of workers "engaged in . . . interstate commerce" under section 1. Just as the ramp supervisor in *Saxon* who loaded and unloaded cargo on and off airplanes flying in interstate commerce, Sorroza loaded and unloaded goods on and off trucks moving in interstate commerce. (*Saxon*, *supra*, 596 U.S. at p. 463.) In his declaration, Sorroza stated "[t]he *main* product" he unloaded arrived from Arizona and that he loaded some trucks traveling to Arizona. (Italics added.) He played "a direct and 'necessary role in the free flow of goods' across borders" and was "actively 'engaged in transportation' of those goods." (*Saxon*, at p. 458.) "'[T]here could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when [the worker] is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit." (*Id.* at pp. 458–459; see also *Ortiz v. Randstad Inhouse Services., LLC* (9th Cir. 2024) 95 F.4th 1152, 1161–1162 [applying *Saxon* and finding a warehouse worker who processed and stored packages, but did not load or unload packages from shipping containers, was a transportation worker].) Therefore, Sorroza was a transportation worker engaged in interstate commerce.

Accordingly, substantial evidence supports the trial court's finding that Sorroza, who loaded and unloaded goods on and off trucks that travel in interstate commerce, belonged to a "class of workers engaged in foreign or interstate commerce." (§ 1.) Sorroza was exempt from the FAA's coverage.

15

*E. Express's Additional Arguments*

Express presents additional arguments that disagree with our analysis. None is persuasive.

First, in its opening brief, Express argues section 1's exemption applies solely to transportation workers employed by a transportation company. It contends Sorroza did not submit any evidence showing Express or Jellco is a transportation company in the business of moving goods. Express attempts to distinguish *Saxon* from the present case by contending, unlike the ramp supervisor in *Saxon* who worked for a transportation company, Sorroza did not work for a transportation company.

This argument ignores *Saxon*. *Saxon* does not require determining whether the transportation worker works for a transportation company. In fact, *Saxon* rejected considering the business entity in its analysis of section 1's exemption. Under *Saxon*, we first determine the particular "'class of workers'" to which the worker belongs, an analysis that centers on the actual work performed by the class of workers and not on what the business does generally. (*Saxon*, *supra*, 596 U.S. at pp. 455–456.) Then, we consider "whether that class of workers is 'engaged in foreign or interstate commerce.'" (*Id.* at p. 455.)

Second, Express argues in its opening and reply briefs the Second Circuit Court of Appeals' reasoning in *Bissonnette v. LePage Bakeries Park St., LLC* (2022) 49 F.4th 655 (judg. vacated and cause remanded (2024) 601 U.S. 246) should dictate the outcome here. But, during the pendency of the appeal of the instant matter, the Supreme Court decided *Bissonnette v. LePage Bakeries Park St., LLC* (2024) 601 U.S. 246 (*Bissonnette*), rejecting the Second Circuit's reasoning. We invited the parties to file supplemental letter briefs regarding the effect of *Bissonnette* on the instant matter and received responsive supplemental briefs from both.

In *Bissonnette*, the "only question before" the Supreme Court was "whether a transportation worker must work for a company in the transportation industry to be

16

exempt under [section 1] of the FAA." (601 U.S. at p. 252.) Two franchisees of Flower Foods, Inc. picked up baked goods from local warehouses and delivered them to local shops in designated territories. (*Id.* at p. 249) They brought a putative class action against Flower Foods, Inc., despite signing an arbitration agreement. (*Id.* at p. 250.) The federal district court compelled arbitration. (*Ibid.*) The Second Circuit affirmed, holding these workers were not exempt from the FAA because they worked in the baking industry rather than the transportation industry. (*Id.* at p. 251.)

The Supreme Court concluded "[a] transportation worker need not work in the transportation industry to fall within" section 1's exemption from the FAA's coverage. (*Bissonnette*, *supra*, 601 U.S. at p. 256.) It explained *Saxon* "expressly declined to adopt an 'industrywide' approach . . . ." (*Id.* at p. 253.) *Saxon*'s exemption inquiry focused on the work performed by the class of workers, not on the employer's industry. (*Ibid.*) *Bissonnette* reiterated section 1's exemption was "'narrow'" in scope, covering only transportation workers who "'at least play a direct and "necessary role in the free flow of goods" across borders.'" (*Id.* at p. 256.)

In its supplemental letter brief, Express argues *Bissonnette* demonstrates Sorroza was not a transportation worker exempt from the FAA's coverage because he did not *frequently* load and unload cargo crossing state lines. This argument is identical to Express's argument at oral argument (absent the citation to *Bissonnette*). As discussed above, we reject this argument.[3]

_____

[3] We note the Supreme Court stated explicitly it was not addressing whether the workers in *Bissonnette* fell within section 1's exemption. (*Bissonnette*, *supra*, 601 U.S. at pp. 252, fn. 2.) Subsequently, it devoted no attention to whether the workers performed certain duties that would qualify them as transportation workers, the issue on which Express focused its entire *Bissonnette* analysis on in its supplemental letter brief. Although *Bissonnette* reiterated *Saxon*'s definition of a transportation worker, the only issue in *Bissonnette* was "whether a transportation worker must work for a company in the transportation industry to be exempt" from the FAA's coverage—an issue Express failed to discuss in its supplemental letter brief, except in a summary of the case. (*Bissonnette*, at pp. 252, 256.)

17

Third, Express argues most federal courts have held only workers who are "'personally responsible' for transporting goods" or who "'oversee the transportation of goods in the transportation industry itself'" fall within section 1's exemption, citing, among other federal district court cases, *Veliz v. Cintas Corp.* (N.D.Cal., Apr. 5, 2004, No. C 03-1180 SBA) 2004 U.S. Dist. Lexis 32208.  It asserts this rule remains true even after *Saxon*.  But *Saxon* rejected the argument "that only workers who physically move goods or people across foreign or international boundaries—pilots, ship crews, locomotive engineers, and the like—are 'engaged in foreign or interstate commerce.'" (*Saxon*, *supra*, 596 U.S. at p. 461.)  And, as explained above, *Bissonnette* rejected adopting an industrywide approach.  Express's argument therefore fails.

In sum, substantial evidence supports the trial court's finding Sorroza loaded and unloaded goods on and off trucks moving across state lines to and from Arizona.  Under *Saxon*, one who loads cargo on or unloads "cargo from a vehicle carrying goods in interstate transit" is "intimately involved with the commerce (*e.g.*, transportation) of that cargo." (*Saxon*, *supra*, 596 U.S. at p. 458.)  Therefore, Sorroza was a transportation worker who falls within section 1's exemption.

18

DISPOSITION

The trial court's order is affirmed.  Respondent is entitled to costs on appeal.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


DELANEY, J.